IN THE CIRCUIT COURT OF DESHA COUNTY, ARKANSAS
(CIVIL DIVISION)

CASE NO. CV-2009-___188-3___

| | | |
|---|---|---|
| ALAN GOODGAME, RICHARD GOODGAME, | § | PLAINTIFFS |
| RICHARD GOODGAME & ASSOCIATES, INC., | § | |
| GOODGAME FARMS, J.V., GOODGAME FARMS | § | |
| PARTNERSHIP and AG FARMS, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| BAYER CROPSCIENCE, LP, | § | DEFENDANTS |
| BAYER CROPSCIENCE HOLDING, INC., | § | |
| BAYER CORPORATION, BAYER AG, | § | |
| BAYER BIOSCIENCE NV AND | § | |
| RICELAND FOODS, INC. | § | |

**JURY TRIAL DEMANDED**

# COMPLAINT

ALAN GOODGAME, RICHARD GOODGAME, RICHARD GOODGAME & ASSOCIATES, INC., GOODGAME FARMS, J.V., GOODGAME FARMS PARTNERSHIP and AG FARMS, INC., Plaintiffs, file their Complaint against BAYER CROPSCIENCE, LP, BAYER CROPSCIENCE HOLDING, INC., BAYER CROPSCIENCE CORPORATION, BAYER AG AND BAYER BIOSCIENCE NV (collectively "Bayer" or "the Bayer Defendants"), and RICELAND FOODS, INC., (Riceland), collectively referred to at times as Defendants for damages caused to them and their property from the improper release of genetically modified organisms into the Arkansas rice supply and Defendants subsequent lack of disclosure thereof.

## A. PARTIES

1.      Plaintiffs, ALAN GOODGAME, RICHARD GOODGAME, RICHARD GOODGAME & ASSOCIATES, INC., GOODGAME FARMS, J.V., GOODGAME FARMS



EXHIBIT
4

1

FILED 8-18-09 BY Kmea0
@ 9:00 O'CLOCK A M
SKIPPY LEEK - DESHA COUNTY
CIRCUIT COURT CLERK
ARKANSAS

PARTNERSHIP and AG FARMS, INC., are individuals and/or domestic entities engaged in rice farming with real property interest in Desha County, Arkansas. Plaintiffs shall be collectively referred to as "Plaintiffs."

2.      Defendant Bayer CropScience, LP is a Delaware corporation with its principle office at 2711 Centerville Road, Suite 400, Wilmington, DE 19808. It succeeded by name change or assignment to the interests and liabilities of Aventis CropScience USA LP in June of 2002. Bayer CropScience LP operates, directly or through its subsidiaries and affiliates, within Arkansas such that it is subject to the state's minimum contacts jurisdiction, and it can be served through its registered agent Corporation Service Company at 300 Spring Building, Suite 900, 300 S Spring Street, Little Rock, AR 72201. **Service will be by certified mail/restricted delivery/return receipt requested.**

3.      Defendant Bayer CropScience Holding, Inc. is a Delaware corporation with its principle office at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina 27709. It is the general partner of Bayer Cropscience LP, and it was previously named Aventis Cropscience USA Holdings, Inc.   Bayer Cropscience Holding, Inc operates, directly or through its subsidiaries and affiliates, within Arkansas such that it is subject to the state's minimum contacts jurisdiction, and it can be served through its registered agent Corporation Service Company at 300 Spring Building, Suite 900, 300 S Spring Street, Little Rock, AR 72201. **Service will be by certified mail/restricted delivery/return receipt requested.**

4.      Bayer Corporation is an Indiana corporation whose principal place of business is at 100 Bayer Road, Building 4, Pittsburgh, Pennsylvania 15205. Bayer Corporation is the domestic holding company for many Bayer subsidiaries and affiliates.   Through these subsidiaries and affiliates, Bayer Corporation operates within Arkansas such that it is subject to the minimum contacts jurisdiction of the state. Bayer Corporation can be served through its

2

registered agent Corporation Service Company at 300 Spring Building, Suite 900, 300 S Spring Street, Little Rock, AR 72201. **Service will be by certified mail/restricted delivery/return receipt requested.**

5.      Bayer AG is a German corporation that, individually or through subsidiaries that it controls, researches, manufactures, tests, markets, and sells agricultural chemicals and technologies, such as the genetically-modified rice seeds at issue here, and it is the registered owner of the "Liberty Link" trademark for rice and other agricultural products. Bayer AG is a successor by merger to Bayer Cropscience GmbH, and it has succeeded to all the debts, liabilities, and commitments of Bayer Cropscience GmbH. Bayer AG operates, through its subsidiaries and affiliates, within Arkansas such that it is subject to the minimum contacts jurisdiction of the state.

6.      Defendant Bayer BioScience NV is a Belgium corporation and wholly-owned subsidiary of Bayer AG. Bayer BioScience NV researches, develops, and markets seeds including the genetically-modified rice seeds at issue here. Bayer BioScience NV is an assignee of three or more U.S. patents relating to genetically-modified rice seeds or traits. Bayer BioScience NV operates, through its subsidiaries and affiliates, within Arkansas such that it is subject to the minimum contacts jurisdiction of the state.

7.      At all times relevant to this action, Defendants, Bayer CropScience, LP, Bayer CropScience Holding, Inc., Bayer Corporation, Bayer AG and Bayer BioScience NV have been unified in interests and ownership. The entities are alter-egos of each other, and they have been collectively run as a single business enterprise. Thus, they will subsequently be collectively referred to as "Bayer."

8.      Riceland Foods, Inc. is a domestic agricultural cooperative. Riceland Foods, Inc. may be served through its registered agent Terry L. Richardson, 2120 South Park Avenue,

Stuttgart, Arkansas 72160.  **Service will be by certified mail/restricted delivery/return receipt requested.**

9.      This Court has subject matter jurisdiction pursuant to Arkansas Code §16-13-201(a).  This Court has personal jurisdiction over Bayer because they did business in Arkansas related to the claims made herein and they have continuous and systematic business activities in Arkansas.  This Court has personal jurisdiction over Riceland because it is headquartered in Arkansas.

## B. VENUE

10.      Venue is proper in this county pursuant to Arkansas Code §16-60-101, because the individual plaintiffs suffered damages to real property located in Desha County and the business entity plaintiffs have their principal office in Desha County.

## C. FACTUAL BACKGROUND

11.      Arkansas farmers have grown long grain and medium grain rice for almost 100 years.  Many Arkansas rice farms have been passed down from generation to generation.  Arkansas rice is marketed as a commodity domestically and abroad to foreign countries. In 2005, Arkansas farmers planted approximately 1.54 million acres of long-grain rice generating sales exceeding one billion dollars.

12.      Arkansas rice farmers grow <u>non</u>-genetically modified rice.  They do not grow genetically modified rice for several reasons.  First, it has not been scientifically proven that genetically modified rice is safe for long-term human or animal consumption.  Second and as a result, many American and foreign consumers will not buy it.   Third, there is no known method to prevent genetically modified traits from contaminating non-genetically modified rice varieties.  Finally, growing genetically modified rice permanently damages a farmer's or a landowner's rice crops, land, and future crops, because it is an uncontrollable organism that stays in the soil to

mutate and have unknown impacts. For these reasons, Arkansas rice farmers, including Plaintiffs, have not intentionally planted genetically modified rice for commercial production.

13.    Bayer, through its predecessors Aventis and AgrEvro, entered into a business endeavor to develop new technology in the rice industry consisting of new varieties of rice through developing, planting, and testing genetically modified rice known as Liberty Link Rice ("LLRICE"). The idea behind Bayer developing LLRICE was that rice farmers battle problems with weeds and wild forms of rice, commonly known as "red rice," that negatively affect their production and profit. Bayer, through its predecessors and its own actions, created/developed LLRICE which has a genetically modified protein that allegedly makes the LLRICE rice resistant to glufosinate, a herbicide that Arkansas farmers could apply to their crops to kill weeds, including red rice, without concern of harming their rice crop. Bayer's ultimate goal was to develop and sell to rice farmers a genetically modified variety of rice (containing the genetically modified LLRICE trait(s)) along with the Liberty® herbicide, thus, controlling a substantial part, if not all, of the Arkansas rice market reaping them millions if not potentially billions of dollars.

14.    Bayer and/or its predecessor Aventis, planted and tested thousands of different LLRICE varieties/types (or LLRICE "events" as Bayer often refers to its different LLRICE varieties/types), including but not limited to the specific types known as Liberty Link Rice 62 ("LL62"), Liberty Link Rice 601 ("LL601") and Liberty Link Rice 604 ("LL604") in fields across the United States from approximately 1996 to 2006. Following the field trials, Bayer decided not to market its LLRICE, including but not limited to LL62, LL601 and/or LL604. Bayer realized that Arkansas and U.S. consumers along with Europe and other markets did not want genetically modified foods, specifically genetically modified rice. Accordingly, Bayer never submitted LL601, LL604 as well as many of its other LLRICE varieties (or LLRICE events) to the U.S. Department of Agriculture's Animal and Plant Health Inspection Service, the U.S. Food and

Drug Administration, or the U.S. Environmental Protection Agency for approval. Therefore, LL601, LL604 and many of Bayer's other LLRICE varieties (or LLRICE events) was/were never approved for cultivation, sale, or human consumption in the United States.

15.     At all relevant times, LLRICE was or should have been in the exclusive control of Bayer and its agents. During its field tests, Bayer, along with everyone in the rice industry, knew that rice is a cross-pollinating plant. As such, Bayer knew or should have known that the LLRICE was likely to cross-pollinate with marketable, non-genetically modified rice, thereby forever contaminating the genetic makeup of natural non-genetically modified rice. At the time of the field tests and through the present-day, Bayer also knew or should have known that the LLRICE and the other genetically modified varieties could contaminate non-genetically modified rice and land including but not limited to the following ways: (1) birds and/or other natural elements such as wind transporting genetically modified rice to other fields containing non-genetically modified rice, (2) use of equipment on fields where genetically modified rice was being planted/grown/tested and then using the same equipment on fields that were supposed to only contain non-genetically modified rice, thereby transporting genetically modified rice and contaminating non-genetically modified rice fields, and (3) commingling of genetically modified rice with non-genetically modified rice during harvest, transport, storage and processing.

16.     During the years that Bayer and/or its agents were developing and testing the LLRICE (from 1996 to 2006), Bayer and/or its agents contaminated non-genetically modified Arkansas rice and land with LLRICE, including but not limited to the varieties/types known as LL62, LL601 and LL604 (commonly referred to in the industry as the "GMO Contamination"). Bayer caused the GMO Contamination by, among other things, (1) allowing or failing to take proper precautions to prevent cross-pollination, (2) by planting/farming/testing genetically modified rice too close to rice fields that were supposed to only contain non-genetically

modified, (3) failing to take proper precautions to prevent the GMO Contamination through the use of tarps, safe zones, or other methods to prevent contamination, (4) allowing genetically modified rice to commingle with non-genetically modified rice at local rice dryers and/or mills who process/store rice from multiple rice farmers, (5) Bayer's use of equipment on fields where genetically modified rice was being planted/grown/tested and then using the same equipment on fields that were supposed to only contain non-genetically modified rice, thereby transporting genetically modified rice and contaminating non-genetically modified rice fields and (6) improper transportation and storage.

17.    Bayer knew or should have known that because of its actions, that LLRICE, including but not limited to the varieties/types known as LL62, LL601 and LL604 had contaminated the non-genetically modified Arkansas rice and farm land during the years that it was testing the LLRICE. Bayer purposively withheld this information as well as its failures to properly handle its LLRICE from Arkansas rice farmers because they knew the negative impact that LLRICE or any genetically modified rice organism contamination would have on the rice market/industry, if the public was made aware of the contamination or likely contamination. Bayer simply sat back, did nothing, and hoped that the GMO Contamination would not surface.

18.    Riceland is an allegedly farmer-owned cooperative that provides drying, milling and marketing services to over 9,000 farmers in Arkansas and beyond. Riceland is a major rice exporter and is aware that a large amount of rice is grown for export. In the late 1990's, Bayer approached Riceland and requested that it support Bayer's LLRICE project. Riceland specifically informed Bayer that foreign markets, including but not limited to the European Union (the "EU") would not purchase genetically modified rice. Riceland advised Bayer that if Bayer's LLRICE contaminated the rice industry before markets accepted such genetically modified rice, that such contamination would destroy the United States ("U.S.") rice export

industry and would severely impact the U.S. domestic market. Thus, Riceland and Bayer knew that the EU and other foreign countries would not import rice contaminated with genetically modified rice and that if LLRICE contaminated the U.S. rice industry that such an occurrence would negatively affect the rice market and U.S. rice farmers. In the late 1990's Riceland informed Bayer that it was not going to endorse Bayer's LLRICE project, but that it was interested in being kept abreast on Bayer's genetically modified rice technology.

19. Accordingly, from the late 1990's onward, Bayer kept Riceland abreast regarding its LLRICE project by providing Riceland frequent updates with information regarding the development, testing, and growing of LLRICE. After being kept abreast regarding the LLRICE project and sometime in the early 2000's, Riceland changed its views on limiting its involvement with Bayer's LLRICE project from being a just a recipient of information to taking a more active involvement in the LLRICE project. In the early 2000's Riceland entered into contract(s) with Arkansas rice farmer(s) to actually grow LLRICE for Bayer. In addition to contracting to grow LLRICE, Riceland also milled and/or processed LLRICE within its facilities. As such, Riceland contributed to the cause of the GMO Contamination by, among other things, (1) allowing or failing to take proper precautions to prevent cross-pollination, (2) by planting/farming/testing genetically modified rice too close to rice fields that were supposed to only contain non-genetically modified, (3) failing to take proper precautions to prevent the GMO Contamination through the use of tarps, safe zones, or other methods to prevent contamination, (4) allowing genetically modified rice to commingle with non-genetically modified rice at its rice dryers/milling facilities, (5) the use of equipment on fields where genetically modified rice was being planted/grown/tested and then using the same equipment on fields that were supposed to only contain non-genetically modified rice, thereby transporting genetically modified rice and

contaminating non-genetically modified rice fields and (6) improper transportation and/or storage.

20.      Periodically, during the development, testing and growing of its LLRICE, Bayer would apply to the USDA for approval of specific varieties/types of its LLRICE in hopes that the USDA would approve such varieties/types as being safe for human consumption. Bayer's hopes were that if it could get the USDA to say that its LLRICE was safe for human consumption that other foreign markets would accept its genetically modified rice. In the late 1990's and/or the early 2000's, Bayer applied to the USDA to approve one of its specific LLRICE varieties/types known as LL62 as being safe for human consumption, which the USDA did approve. However and with that said, Bayer knew that even though the USDA approved LL62 to be safe for human consumption, that other foreign markets, including but not limited to the EU, would not purchase rice contaminated with LLRICE varieties, even if such varieties had been approved by the U.S. From 1996 to December 2005, Bayer was testing both LLRICE varieties that had been approved by the USDA (as an example LL62) and varieties that had not been approved (as an example LL601 and LL604). From 1996 to December 2005, on multiple occasions, Bayer and Riceland discovered that LL62 (which had been approved by the USDA) had contaminated multiple non-genetically modified rice varieties (as an example, the medium grain rice variety known as Bengal) and that such rice was subsequently distributed to unknowing U.S. Rice farmers who subsequently planted, grew, harvested, and sold the contaminated rice. Bayer and Riceland became aware of the LL62 contamination but took the position that since the USDA had approved LL62 in the U.S., that they had no obligation to disclose the contamination to the U.S. rice farmers. Bayer and Riceland sat back, did nothing and gambled that the contaminated rice would not be sold to and detected by foreign customers. From 1996 to December 2005, despite the fact that Bayer and Riceland were aware that multiple rice varieties that were supposed to be

non-genetically modified rice varieties were contaminated with LLRICE, Bayer and Riceland failed to disclose to the U.S. rice farmers that such contamination was occurring and failed to take the necessary steps to prevent further contamination from occurring.

21.     Bayer's and Riceland's GMO Contamination was first discovered by foreign markets in January 2006 by a French customer of Riceland, who reported their discovery to Riceland. In January and February of 2006, Riceland knew that the presence of genetically modified rice would be of material and significant importance to all rice farmers who were in the process of making planting decisions for the 2006 growing season. Despite this, Riceland suppressed this information and did not disclose the GMO Contamination to any rice grower, including its own farmer members, until after all rice farmers had planted their fields, thereby contaminating them.

22.     Plaintiffs, all or some, are members of Riceland. Riceland had a fiduciary duty to disclose what it knew about the GMO Contamination to its farmer members. If Riceland had disclosed its knowledge to its own members, including Plaintiffs, Arkansas rice farmers would have been able to make the decision to not plant rice in the spring of 2006. Thus, Arkansas rice farmers, including Plaintiffs could have altogether avoided having their crops and land contaminated with LLRICE, including but not limited to LL601, LL604, LL62 or any of Bayer's other genetically modified varieties. Riceland's conduct consisting of its non-disclosure of the GMO Contamination is conduct evidencing "malice" and/or "reckless disregard," as referenced in Arkansas Code §16-55-206(1). Riceland failed to disclose what it knew in wanton and conscious disregard to the consequences.

23.     After being notified by its French customer of the GMO Contamination, Riceland collected samples of rice from several grain storage locations. These storage locations included rice from Riceland's five-state production area including Arkansas. Even though Bayer knew that their genetically modified rice had contaminated the Arkansas commercial rice supply for

years, Bayer finally began developing tests to determine the specific LLRICE variety that had contaminated the rice received by the French customer as well as to determine whether any of the rice from Riceland's storage locations had been contaminated. In developing the tests to determine whether rice had been contaminated, Bayer's scientists first developed a test that could detect whether any LLRICE variety had contaminated the rice. However, at the direction of Bayer's management, Bayer developed a strategy test to only test for certain LLRICE varieties so as to limit the discovery of the extent of Bayer's and Riceland's contamination of the U.S. rice industry. With that said, upon receiving the test results from Bayer's genetically modified rice tests, Riceland discovered that a "significant number [of samples] tested positive for the Bayer trait." The positive results were "geographically dispersed and random throughout the rice-growing area" including Arkansas.

24.     In June 2006, Riceland provided Bayer with rice samples. In July 2006, Bayer confirmed the positive results for one particular LLRICE variety contaminant, LL601. Bayer did not report the GMO Contamination to the U.S. government until July 31, 2006. As set forth above, Bayer and Riceland knew or should have known that Arkansas rice fields had been contaminated with LLRICE, including but not limited to LL601, LL604 and LL62 long before this date. However, Bayer and Riceland intentionally withheld this information from the Arkansas rice farmers, including Plaintiffs, so that the farmers would plant their rice crops to the benefit of Riceland and Bayer and to the detriment of the farmers.

25.     The GMO Contamination was first made public in mid-August 2006. On August 18, 2006, the U.S. Department of Agriculture announced that LL601 had been discovered in the rice supply. The response in the rice markets was swift and negative. On August 19, 2006, Japan suspended imports of long-grain rice from the United States until shipments could be certified to be free of any trace of unapproved or genetically modified rice varieties. On August 24, 2006 the

European Union announced that it would require all long-grain rice imported from the U.S. to be tested and certified to be free of LL601 or other genetically modified varieties. Other significant export markets, such as Korea, Saudi Arabia, and Iraq either banned or significantly disfavored American rice.

26.     United States farmers depend heavily on export markets, because they export approximately 264,000 tons of long-grain rice to the European Union alone. The loss of the export markets severely damaged American rice farmers including Plaintiffs. In fact, the Chicago Board of Trade (CBOT) rice future market slashed the price of rice immediately, with futures losing more than 5% of their value the day of the announcement.

27.     As a part of the above, the rice farming industry learned that LL601 contaminated a popular variety of rice known as Cheniere. Prior to the GMO contamination, Arkansas rice farmers planted the Cheniere rice variety because it was proving to have substantially higher yields, on average twenty barrels (or bushels) per acre. Along with higher yields, the Cheniere variety also proved to have a better milling quality resulting in higher grades and, thus, higher prices for rice farmers. Additionally, Cheniere was less susceptible to shattering in high winds. Due to the GMO contamination of Cheniere, Arkansas rice farmers, including Plaintiffs, could no longer plant Cheniere resulting in lost profits.

28.     When Plaintiffs thought the situation could not get worse, on March 5, 2007, they were informed that Clearfield 131 seed stocks were found to have been contaminated with another LLRICE variety, LL604. Rice farmers were having great success using Clearfield 131 to combat red rice, thus increasing their yields and profits. In March of 2007, rice farmers, including Plaintiffs were prohibited from planting Clearfield 131. Due to the fact that Cheniere and Clearfield 131 were banned, Plaintiffs were left to scramble for seed at the beginning of their 2007 planting season. Plantiffs, like most Arkansas farmers, were unable to find enough

12

unaffected seed and were unable to plant rice on all of their available land. The rice that was planted was less profitable than Cheniere or Clearfield 131 because of reduced yields and added expense in controlling weeds like red rice.

29.    As a direct consequence of the acts and omissions of Bayer and Riceland, Plaintiffs have been significantly damaged both in the short term and long term. They lost profits from their 2006 and subsequent crops, from the reduced planting, and from the loss of the most bountiful seed varieties. In addition, Plaintiffs' land has been permanently contaminated.

### D. NEGLIGENCE OF BAYER

Plaintiffs incorporate by reference paragraphs 1 - 29.

30.    Bayer owed legal duties to Plaintiffs that they breached proximately causing damage to Plaintiffs. First, Bayer had a duty to prevent injury to Plaintiffs when it reasonably appeared or should have reasonably appeared that the testing of genetically modified rice had created a dangerous condition for rice farmers. Second, they had a duty to exercise reasonable care to avoid the foreseeable risk of injury to Plaintiffs and a duty to take affirmative action to control or avoid increasing the danger they created by planting and testing genetically modified rice. Third, Bayer had a duty to use ordinary care in making representations and in ascertaining the accuracy of information given to Plaintiffs. Fourth, Bayer had a duty to exercise reasonable care in performing services that they should have recognized as necessary for the protection of Plaintiffs and their property.

31.    As a product manufacturer, Bayer and its agents had a duty to use ordinary care in the design and testing of any genetically modified rice including LL601, LL62 and LL604 to protect Plaintiffs from unreasonable risk of harm. They failed to use ordinary care in the design and testing of their genetically modified rice. Bayer's negligent design and testing was a

proximate cause of the harm to Plaintiffs. Bayer is liable for all damages to Plaintiffs proximately caused by its actions.

32.   Bayer had a further duty to test for genetically modified rice including LL601, LL604 and LL62 in a manner that would not cause harm or injury to Plaintiffs. Bayer failed to adequately test for these genetically modified rice or to take appropriate steps to prevent the damage described above. Bayer's negligent testing was a proximate cause of the harm to Plaintiffs. Bayer is liable for all damages to Plaintiffs proximately caused by their actions.

33.   A product manufacturer, like Bayer and its agents, has a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product. A violation of this duty is negligence. Bayer violated its duty to give Plaintiffs a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of any genetically modified rice, including LL601, LL604 and LL62. The inadequate warnings were a proximate cause of the harm to Plaintiffs. Bayer is liable for all damages to Plaintiffs proximately caused by its actions.

34.   Bayer had a duty to properly instruct and train those who tested, used, handled, studied, transported, stored, planted and harvested genetically modified rice, including LL601, LL604 and LL62. A product manufacturer and its agent have a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use. A violation of this duty is negligence. Bayer failed to properly instruct and train those who tested, used, handled, studied, transported, stored, planted and harvested genetically modified rice.

35.   Bayer's actions were the proximate cause of the harm to each Plaintiff in excess of $75,000. Bayer is liable for all damages to Plaintiffs proximately caused by its actions.

### E. RES IPSA LOQUITUR

Plaintiffs incorporate by reference paragraphs 1 - 35.

14

36.   The improper release of genetically modified rice, including LL601, LL604 and LL62 by Bayer could not have occurred without their negligence because it was under their sole management and control.  Bayer designed and manufactured genetically modified rice and its agents tested/planted/farmed genetically modified rice on Arkansas property.  Bayer's genetically modified rice then contaminated the Arkansas rice supply, which could not have occurred without Bayer's negligence.  Bayer had exclusive control over their genetically modified rice and such a damaging and illegal substance could not have escaped into the Arkansas and U.S. rice supply without a lack of proper care.

37.   Plaintiffs were each damaged by an amount of more than $75,000 as a result of circumstances that could not have occurred without the negligence of Bayer.

## F. NEGLIGENCE OF RICELAND

Plaintiffs incorporate by reference paragraphs 1 - 37.

38.   Riceland possessed information that they knew was critical to every American rice grower.  A reasonably-prudent rice marketer, in the same or similar circumstances, would have disclosed the information regarding possible genetically modified rice contamination to its members and the rice farming community at-large.  Riceland knew that any disclosure whether to its members or any Arkansas rice farmer would immediately spread throughout the public.  It was entirely foreseeable to Riceland that farmers with the information about the genetically modified rice contamination would not plant certain long or medium grain varieties known to be contaminated, and thus their nondisclosure foreseeably caused farmers to act in a way they would not have otherwise.  Therefore, the entire extent of the farmers' damages was a foreseeable consequence of Riceland's non-disclosure.

39.   Riceland's negligence proximately caused damages to each Plaintiff in excess of $75,000.

## G. GROSS NEGLIGENCE

Plaintiffs incorporate by reference paragraphs 1 - 39.

40.    Bayer's acts and/or omissions described above constitute gross negligence. Bayer knew the consequences of contamination, yet they did not exert any substantial or reasonable effort to avoid the devastating consequences contamination showing reckless disregard. Bayer acted with actual malice, insult, aggression, and/or extreme recklessness, and showed a wanton disregard for the rights of Plaintiffs.

41.    Riceland also acted with reckless indifference by not disclosing the contamination when they knew that contamination would have devastating consequences on the rice crops its farmers would soon be planting. Riceland acted with actual malice, insult, aggression, and/or extreme recklessness, and showed a wanton disregard for the rights of Plaintiffs.

42.    Plaintiffs have suffered injury and seek punitive damages arising from Bayer and Riceland's reckless, malicious, insulting, aggressive, and/or willful conduct. Plaintiffs also seek all costs and attorney's fees as allowed by law.

## H. FRAUDULENT CONCEALMENT

Plaintiffs incorporate by reference paragraphs 1 - 42.

43.    Riceland had a special relationship to the farmer-member Plaintiffs and therefore a duty to disclose what it knew about any genetically modified rice contamination. As soon as Riceland knew of the contamination, their nondisclosure became actionable fraud, because it violated their duty to disclose. Riceland knew that Plaintiffs were operating under a mistaken belief that no genetically-engineered variety had contaminated Arkansas rice. Riceland also knew that none of the Plaintiffs had access to the contamination knowledge Riceland possessed. Riceland's failure to disclose the contamination proximately caused Plaintiffs' damages, as they

would not have planted certain long grain or medium grain rice varieties had they known of their contamination.

44.     Plaintiffs demand from Riceland damages in an amount of more than $75,000 per Plaintiff to compensate them for damages that resulted from Riceland's nondisclosure.

## I. TRESPASS

Plaintiffs incorporate by reference paragraphs 1 - 44.

45.     Bayer's acts described above constitute trespass.  Plaintiffs owned or had a lawful right and continue to own or have a lawful right to possess their land.  Bayer intentionally caused and permitted genetically modified rice varieties to enter Plaintiffs' real property.  Specifically, Bayer planted/farmed/tested genetically modified rice on U.S. rice fields from 1996 to 2001 thereby contaminating the seed rice sold and/or distributed to Plaintiffs.

46.     Bayer's contamination of Plaintiffs' land has permanently damaged Plaintiffs' real property in the form of loss of use.   Specifically, Plaintiffs are now unable to grow for certain non-genetically modified rice on their land.  Plaintiffs' real property has also been damaged in the form of loss of market value as their land is less marketable and valuable.

47.     Plaintiffs seek compensatory and/or punitive damages, including lost business profits, for Bayer's acts and/or omission, which have resulted in trespass, and all costs and attorney's fees as allowed by law.

## J. CONVERSION

Plaintiffs incorporate by reference paragraphs 1 - 47.

48.     Bayer's acts and/or omissions described above constitute conversion.  At all relevant times, Plaintiffs owned or had a lawful right and continue to own or have a lawful right to possess their personal property.  Bayer intentionally caused and permitted genetically modified rice varieties to enter Plaintiffs' real property.  Specifically, Bayer

planted/farmed/tested genetically modified rice on U.S. rice fields from 1996 to 2001 thereby contaminating the seed rice sold and/or distributed to Plaintiffs.

49.     Bayer's intentional contamination of Plaintiffs' land has permanently damaged Plaintiffs' real property in the form of loss of use.   Specifically, Plaintiffs' are now unable to grow for certain non-genetically modified rice on their land.  Plaintiffs' real property has also been damaged in the form of loss of market value as their land is less marketable and valuable. Additionally, Bayer's trespass in the form of the contamination has interfered with Plaintiffs' business causing lost profits.

50.     Plaintiffs seek compensatory and/or punitive damages for Bayer's acts and/or omission, which have resulted in conversion, and all costs and attorney's fees as allowed by law.

## K. PRIVATE NUISANCE

Plaintiffs incorporate by reference paragraphs 1 - 50.

51.     Bayer has created a nuisance through the contamination of the U.S. rice supply with genetically modified rice by testing, growing, storing, distributing and/or transporting genetically modified rice, which constitutes an unreasonable and significant interference with public rights, public health, public comfort and public convenience.

52.     Bayer's substantial interference is imposed on a considerable number of individuals and entities.  Bayer planted, harvested, tested, stored, distributed and/or transported genetically modified rice without adequate safeguards to prevent contamination, cross-pollination and commingling of genetically modified rice with the U.S. rice supply and with the knowledge that genetically modified rice would likely contaminate the human food supply prior to regulatory approval.

53.     Plaintiffs have suffered injuries distinct from the general public in that they have suffered and continue to suffer, among others, business losses in the form of rejection of their

crops in certain markets, reduced or restricted demand for their crops, reduced prices for their crops, added costs for segregation in order to sell their crops, increased costs for testing to ensure that their crops are not contaminated with genetically modified rice and contamination of their property.

54.     These actions are the direct and proximate causes of damages that Plaintiffs have suffered as set forth herein.

55.     Plaintiffs seek compensatory damages and injunctive relief requiring abatement of the nuisance by mandating that Bayer decontaminate Plaintiffs' farming, harvesting and transportation equipment and storage facilities to prevent future contamination.

## L. NEGLIGENCE PER SE

Plaintiffs incorporate by reference paragraphs 1-55.

56.     Bayer and Riceland's acts and/or omissions as described above constitute negligence per se. ACA  Section 2-15-202, provides definitions for that subchapter as follows:

(1)     "Characteristics of commercial impact" means characteristics that may adversely affect the marketability of rice in the event of commingling with any other rice and includes, but is not limited to, those characteristics:

    (A)     That cannot be identified without the aid of specialized equipment or testing;

    (B)     That create a significant economic impact in their removal from commingled rice; and

    (C)     Whose removal from commingled rice is not feasible; and

(2)     "Person" includes any individual, partnership, limited liability company, limited liability partnership, corporation, firm, company, or any other entity doing business in Arkansas.

57.     ACA Section 2-15-203 provides as follows:

Prohibition of rice with characteristics of commercial impact.  No person may introduce, sell, plant, produce, harvest, transport, store, process, or otherwise handle rice identified as having characteristics of commercial impact, except in compliance with the provisions of this subchapter and the rules adopted by the State Plant Board.

58.     Because LLRICE has and had characteristics of "commercial impact," Bayer and

Riceland (because it entered into contracts to grow LLRICE) was required to comply with the

provisions of the above referenced subchapter.   Bayer and Riceland failed to comply with this

subchapter. Therefore, Bayer and Riceland violated ACA Section 2-15-203.

59.     Additionally, ACA Section 2-15-101 sets forth:

(a)     This section shall be known and may be cited as the "Arkansas Crop and
        Research Facilities Protection Act."

(b)     (1)     Any person or entity who willfully and knowingly damages or destroys
                any field crop product that is grown for personal or commercial purposes
                or for testing or research purposes in the context of a product development
                program in conjunction or coordination with a private research facility or a
                university or any federal, state, or local government agency shall be liable
                for twice the value of the crop damaged or destroyed.

        (2)     In awarding damages under this section, the courts shall consider:
                (A)     The market value of the crop prior to damage or destruction; and
                (B)     Production, research, testing, replacement, and crop development
                        costs directly related to the crop that has been damaged or
                        destroyed as part of the value of the crop.

        (3)     Damages available under this section shall be limited to:
                (A)     Twice the market value of the crop prior to damage or destruction;
                        plus
                (B)     Twice the actual damages involving production, research, testing,
                        replacement and crop development cost directly related to the crop
                        that has been damaged or destroyed.

60.     In addition to the above, CFR part 340.1 provides, in part, as follows:

        Introduce or Introduction.  To move into or through the United States, to release
        into the environment, to move interstate or any attempt thereat.

        Regulated article.  Any organism which has been altered or produced through
        genetic engineering, if the donor organism, recipient organism, or vector or vector
        agent belongs to any genera or taxa designated in Section 340.2 and meets the
        definition of plant pest, or is an unclassified organism and/or an organism whose
        classification is unknown, or any product which contains such an organism, or
        any other organism or product altered or produced through genetic engineering
        which the Administrator, determines  is a plant pest or has reason to believe is a
        plant pest.  Excluded are recipient microorganisms which are not plant pests and
        which have resulted from the addition of genetic material from a donor organism

where the material is well characterized and contains only non-coding regulatory regions.

Release into the environment.   The use of a regulated article outside the constraints of physical confinement that are found in a laboratory, contained greenhouse, or a fermenter or other contained structure.

61.   CFR part 340.0 further provides as follows:

Restrictions on the introduction of regulated articles.

(a)  No person shall introduce any regulated article unless the Administrator is:

   (1)  Notified of the introduction in accordance with Section 340.3, or such introduction is authorized by permit in accordance with Section 340.4, or such introduction is conditionally exempt from permit requirements under Section 340.2(b); and
   (2)  Such introduction is in conformity with all other applicable restrictions in this part.

(c)  Performance standards for introductions under the notification procedure.  The following performance standards must be met for any introductions under the notification procedure.
   (1)  If the plants or plant materials are shipped, they must be shipped in such a way that the viable plant material is unlikely to be disseminated while in transit and must be maintained at the destination facility in such a way that there is no release into the environment.
   (2)  When the introduction is an environmental release, the regulated article must be planted in such a way that they are not inadvertently mixed with the non-regulated plant materials of any species which are not part of the environmental release.
   (3)  The plants and plant parts must be maintained in such a way that the identity of all material is known while it is in use, and the plant parts must be contained or devitalized when no longer in use.
   (4)  There must be no viable vector agent associated with the regulated article.
   (5)  The field trial must be conducted such that:
      i.   No viable material shall remain which is likely to volunteer in subsequent seasons, or
      ii.  Volunteers shall be managed to prevent persistence in the environment.

(d)  Procedural requirements for notifying APHIS.

62.   Bayer and Riceland had a duty to comply with the Arkansas Code Annotated, Arkansas State Plant Board Regulations and the Code of Federal Regulations.  Bayer and Riceland had a duty to Plaintiffs to test, grow, store, transport and dispose of LLRICE in a

manner that would not result in the contamination of the rice industry. Bayer and Riceland did not comply with the applicable provisions of the Arkansas Code Annotated. Additionally, Bayer and Riceland did not comply with the applicable provisions of the Code of Federal Regulations. Specifically, but limited to the following, Bayer and Riceland did not obtain the necessary permit(s) as required by the Arkansas State Plant Board Sections relating to the regulation of rice containing characteristics of commercial impact. Furthermore, Bayer and Riceland breached its duties by testing, growing, storing, transporting and disposing of LLRICE in violation of standards that would prevent contamination. Such breaches are the direct and proximate cause of the damages suffered by the Plaintiffs. As a result of Bayer's and Riceland's actions, Plaintiffs have suffered damages proximately caused by the actions and/or inactions of Bayer and Riceland in regards to LLRICE. Plaintiffs seek compensatory and punitive damages for the damages they suffered as a result of Bayer's and Riceland's negligent, reckless and willful conduct. In addition to the above, Plaintiffs are entitled to the applicable double damages as provided by the Arkansas Code Annotated as well as attorney's fees, as permitted by applicable law.

## M.   DAMAGES

Plaintiffs incorporate by reference paragraphs 1 - 61.

63.   The acts and omissions described above which allowed the contamination of the Arkansas rice supply with genetically modified rice, detrimentally affected Plaintiffs' ability to sell their rice.

64.   The contamination of the U.S. rice supply with genetically modified rice has caused the loss of certain markets within the United States and certain export markets for American and Arkansas rice and, coupled with the above-described export declines, has resulted in reduced prices for all U.S. long-grain rice.

22

65.    The cost of segregating non-genetically modified rice from genetically modified rice is significant.   Because there are no approved genetically modified rice products, the distribution, transportation and storage infrastructure is not set up for such segregation.  As a result of the acts and omissions of Bayer described above, Plaintiffs have to take extra steps to attempt to preserve the integrity and economic value of their rice crops.  This includes additional testing both here in Arkansas and in export markets.

66.    Also as a result of Bayer's acts and omissions, Plaintiffs sustained damages other than market loss.  Plaintiffs' other damages may include, but are not limited to the following: decreased yields, decreased rice acreage, seed unavailability, inferior seed varieties, more expensive seed varieties, increased storage costs, decreased milling quality, increased chemical/fertilizer costs, interest on crop loans, shattered rice, red rice, testing for genetically modified rice, increased labor costs, increased harvest/milling costs, increased transportation costs, and lost advantage of producing own seed.

67.    Plaintiffs have also sustained damages to their property as a result of the wrongful conduct described above, through the contamination of their rice farming and production chain, including, but not limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment.  Bayer forever contaminated Plaintiffs' property with genetically modified organisms, decreasing its value and increasing risk to Plaintiffs of future contamination and future crops unsuitable for human or animal consumption. Furthermore, there are no mechanisms in place to stop the spread of this genetically modified organism thereby further damaging Plaintiffs property and increasing the risk that other plants such as red rice will become contaminated.  Plaintiffs also suffered by, among other things, the loss of rice varieties infected with genetically modified rice organisms that never existed before.

68.     In addition to the above, Plaintiffs are entitled to the applicable double damages as provided by the Arkansas Code Annotated as well as attorney's fees, as permitted by applicable law.   All of the damages described and others, both general and specific, both economical and consequential, were proximately caused by Bayer's conduct described above.

69.     PLAINTIFFS HEREBY REQUEST A TRIAL BY JURY.

For these reasons, Plaintiffs demand from all Defendants jointly and severally compensatory damages in an amount of more than $75,000 per Plaintiff, as determined by the trier of fact, costs of Court, pre-judgment interest at the highest rate permitted by law, post-judgment interest from the date of judgment until paid at the highest rate permitted by law, punitive damages in an amount to be determined by the trier of fact.

Respectfully submitted,

GOLDMAN, PENNEBAKER & PHIPPS, P.C.
One International Centre
100 N.E. Loop 410, Ste 1500
San Antonio, Texas 78216
Telephone:     (210) 340-9800
Telecopier:    (210) 340-9888


BY:_____
MARTIN J. PHIPPS (2008108)
Email:          mphipps@gpplaw.com


BANKS LAW FIRM, PLLC
100 Morgan Keegan Drive, Suite 100
Little Rock, AR 72202
Telephone:     (501) 280-0100
Telecopier:    (501) 280-0166

BY:_____
CHARLES A. BANKS (73004)
Email:          cbanks@bankslawfirm.us

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE GENETICALLY MODIFIED RICE LITIGATION | ) ) ) | 4:06MD 1811 CDP |
| This filing pertains to: | ) ) | |
| TILDA LTD. | ) ) | |
| vs. | ) ) | No. 4:07-CV-0457 CDP |
| RICELAND FOODS, INC.; PRODUCERS RICE MILL, INC.; BAYER CROPSCIENCE, INC.; BAYER CROPSCIENCE LP; BAYER AG; BAYER CROPSCIENCE AG; BAYER BIOSCIENCE NV; BAYER CROPSCIENCE HOLDING, INC.; BAYER CROPSCIENCE, LLC; and BAYER CORPORATION | ) ) ) ) ) ) ) ) ) ) | |

---

### FIRST AMENDED COMPLAINT AND PRAYER FOR INJUNCTIVE RELIEF

---

Comes the Plaintiff, Tilda Ltd., and, for its First Amended Complaint and Prayer for Injunctive Relief against the Defendants states:

### PARTIES

1.    Plaintiff, Tilda Ltd. ("Tilda"), is a limited company organized under the laws of the United Kingdom, with its principal place of business in Essex, United Kingdom.

2.    Defendant Riceland Foods, Inc. ("Riceland") is a domestic agricultural cooperative organized under the laws of the State of Arkansas and doing substantial



EXHIBIT
5

business within this district, with its principal place of business in Stuttgart, Arkansas and having as its registered agent for service: Terry L. Richardson at 2120 South Park Avenue in Stuttgart, AR 72160.

3.    Defendant Producers Rice Mill, Inc. ("Producers") is a domestic agricultural cooperative organized under the laws of the State of Arkansas and doing substantial business within this district, with its principal place of business in Stuttgart, Arkansas at 518 Harrison Street.

4.    Defendant Bayer CropScience Inc. is a New York corporation with its principal executive office at 2 TW Alexander Drive, Research Triangle Park, North Carolina 27709. Defendant Bayer CropScience Inc. is engaged in business in the State of Arkansas through its affiliated entity Bayer CropScience, LP.

5.    Defendant Bayer CropScience LP is a Delaware corporation, with its principal place of business located at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina, 27709. Bayer CropScience LP, which was formed when Bayer AG purchased Aventis CropScience USA Holding, Inc., in October 2001, is a corporation that, by itself and through its parent, subsidiaries and predecessor corporations, produces and has produced genetically modified and bio-engineered rice seeds, including, but not limited to, LLRICE 601. Bayer CropScience LP is engaged in business in the State of Arkansas and is registered to do business in the State of Arkansas as a foreign corporation.

6.    Bayer AG is a German corporation which, through its subsidiaries and affiliates over which it exerts substantial control, engages in, among other things, the

2

research, manufacture, testing, marketing, and sale of agricultural chemicals and technologies, including the genetically-modified rice seeds or rice traits at issue here. Through its affiliates and subsidiaries, Bayer AG conducts business in the United States and in the Eastern District of Arkansas and otherwise has a presence in this district sufficient to constitute minimum contacts in order to meet due process requirements for personal jurisdiction.

7.      Bayer Cropscience AG, a wholly-owned subsidiary of Defendant Bayer AG, is a German Corporation which, through its subsidiaries and affiliates over which it exerts substantial control, engages in, among other things, the research, manufacture, testing, marketing, and sale of agricultural chemicals and technologies, including the genetically-modified rice seeds or rice traits at issue here.  Upon information and belief, Bayer Cropscience AG is the successor, by merger, to Bayer Cropscience GmbH.  As a result of that merger, Bayer Cropscience AG has succeeded to and assumed all debts, commitments, and liabilities of Bayer Cropscience GmbH.   Prior to its merger into Cropscience AG, Bayer Cropscience GmbH was a wholly-owned subsidiary of Bayer AG.  Bayer Cropscience GmbH contracted with Louisiana State University to test rice containing the genetically-modified rice seed traits at issue here.  Bayer Cropscience AG currently is the registered owner in the United States of the "Liberty Link" trademark for certain agricultural products, including the genetically-modified rice seeds or rice trait at issue here.  Through its affiliates and subsidiaries, Bayer Corporation AG conducts business in the United States and in the Eastern District of Arkansas and otherwise has a presence in this district sufficient to constitute minimum contacts in order to meet due

3

process requirements for personal jurisdiction.

8.      Bayer Bioscience NV, a wholly-owned subsidiary of Defendant Bayer AG, is a Belgian Corporation involved in the research, development and marketing of seeds including the genetically-modified rice seeds or rice traits at issue here.  Founded in 1982 as a spin-off of the University of Ghent, Belgium, Bayer Bioscience NV is one of the main innovation and research centers for Bayer, as defined in paragraph "13" below. Upon information and belief, Bayer Bioscience NV is the assignee of at least three U.S. patents related to the genetically-modified rice seeds or rice traits at issue here, corresponded with individuals at Louisiana State University, and was the entity to which all unused rice test seed was purportedly returned.  Through its various subsidiaries and affiliates, Bayer Bioscience NV conducts business throughout the United States, including but not limited to the Eastern District of Arkansas.

9.      Bayer Cropscience Holding, Inc. is a corporation formed under the laws of the state of Delaware with its principal place of business at 2 T.W. Alexander Drive, Research Triangle, North Carolina 27709.  Bayer Cropscience Holding, Inc. is the general partner of Bayer Cropscience LP; thus, it has oversight and control over that entity and directs its actions.  Bayer Cropscience Holding, Inc. was previously named Aventis Cropscience USA Holding II Inc., whose predecessor in interest was Aventis Cropscience USA Holding Inc.  After Bayer AG or Bayer Cropscience Ag purchased Aventis, the name was changed to Bayer Cropscience Holding, Inc.; however, the duties, responsibilities, assets and functions of the corporation remained the same, and - for all intents and purposes - Bayer Cropscience Holding, Inc. is merely a successor to

4

Aventis Cropscience USA Holding II Inc. and/or Aventis Cropscience USA Holding, Inc. and has succeeded to all the duties and responsibility of these entities and all predecessor entities. Through its various subsidiaries and affiliates, Bayer Cropscience Holdings, Inc. conducts business throughout the United States, including but not limited to the Eastern District of Arkansas.

10.    Bayer Cropscience LP's limited partners are Bayer Cropscience, LLC and Bayer Cropscience, Inc. Bayer Cropscience, LLC is a Delaware limited liability company with its principal place of business at 2 T.W. Alexander Drive, Research Triangle, North Carolina 27709. Bayer Corporation is the sole owner of Bayer Cropscience, LLC.

11.    Bayer Corporation is an Indiana corporation with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania. Upon information and belief, Bayer Corporation is the domestic holding company, either directly or indirectly, for various Bayer ventures in the United States, including but not limited to Bayer Cropscience LP. Through its various subsidiaries and affiliates, Bayer Corporation conducts business throughout the United States, including but not limited to the Eastern District of Arkansas.

12.    Bayer Cropscience LP, itself and through its parents, subsidiaries, affiliates and predecessor entities, including all of the third-party defendants listed herein, produces or has produced the genetically modified rice seed, seed traits, or rice-related genetic material intended to promote glufosinate herbicide tolerance (sometimes referred to as the LibertyLink trait of LLRICE) that has contaminated the United States' commerical long grain rice supply, which contamination is at issue herein.

5

13.   At all times relevant hereto, there has existed, and presently exists, a unity of interest in ownership between Bayer AG, Bayer Cropscience AG, Bayer Bioscience NV, Bayer Cropscience Holding, Inc., Bayer Cropscience Inc., Bayer Cropscience, LLC, Bayer Corporation, and Bayer Cropscience LP. These Defendants are the alter-egos of one another and, in the case of the parent corporations, exercised decision-making and control over their subsidiaries with respect to the conduct giving rise to Plaintiff's claims. Alternatively, they have constituted a single business enterprise. Bayer AG, Bayer Cropscience AG, Bayer Bioscience NV, Bayer Cropscience Holding, Inc., Bayer Cropscience Inc., Bayer Cropscience, LLC, Bayer Corporation, and Bayer Cropscience LP are hereinafter collectively referred to as "Bayer" throughout this complaint unless otherwise specified.

## JURISDICTION AND VENUE

14.   Jurisdiction and Venue are proper in this Court. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there exists complete diversity of citizenship between the Plaintiff and the Defendants.

15.   This Court has personal jurisdiction over the Defendants because they actively conduct business in Arkansas, have sufficient minimum contacts in Arkansas, and/or otherwise intentionally and purposefully avail themselves of the markets within Arkansas, through manufacturing, production, promotion, sale, marketing and distribution of their products in Arkansas, to render the exercise of jurisdiction by this Court over them proper under the Due Process Clause of the United States Constitution.

6

Also, personal jurisdiction over the Defendants is proper because the Defendants transact business within Arkansas, make contracts within Arkansas, and have committed tortuous acts within Arkansas.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## INTRODUCTION

17.     Tilda is a limited company situated in the United Kingdom. Tilda is in the business of selling rice and rice products in the United Kingdom and elsewhere. Tilda sells branded products to supermarkets and other retailers, and it also sells to other food companies who incorporate Tilda's rice into their products for sale to consumers. A significant part of Tilda's business is in American long grain rice. Tilda has suffered damages as a result of the Defendants' contamination of the United States long-grain rice supply with genetically engineered rice that is not approved for human consumption and which is not permitted to be imported into the European Union (EU) or placed on the market for sale in the EU. As is described in further detail herein, certain long grain rice shipments purchased by Tilda from Riceland and Producers were shipped via sea vessel to Tilda in the EU in 2006. Such rice shipments were seized by EU Customs authorities and/or have since been tested and found to be contaminated with genetically engineered rice, namely LLRICE 601, which is a genetically engineered rice strain produced by Bayer. Due to this contamination, Tilda has been damaged by a precipitous decline in the value of its product, loss of import / export markets, loss of business reputation, and in numerous other ways. The allegations in this Complaint are based upon the personal

7

knowledge of Tilda as to itself, and upon information and belief as to all other matters.

### Overview of U.S. Rice Market

18.   Rice is a staple in the diet for much of the world. It runs a close second to wheat in its importance as a food cereal in the human diet.

19.   According to the United States Department of Agriculture ("USDA"), the United States produces approximately 1.88 billion dollars of rice annually, about half of which is exported to other countries. In 2005, about 80% of American rice exports were long-grain varieties.

20.   Arkansas is the largest rice exporting state in the United States. According to the USDA, Arkansas exported over 619 million dollars worth of rice in 2005.

21.   The United States rice marketing system is commodity-based and gathers, commingles, and ships rice from hundreds of thousands of farms through local, regional, and terminal distribution centers.

22.   In late 1998 and early 1999, concerned with the health and safety aspects of genetically modified crops, the general public in many European Union ("EU") countries rejected food products containing genetic modifications of any type.   No genetically engineered rice is currently approved in the EU and none may be legally imported into the EU or placed on the market within the EU.

23.   In 2005, the EU imported 198,000 tons of long-grain rice from the United States.  Current exports to the EU alone (prior to the events giving rise to this action) are approximately 20,000 tons of rice per month.  The United States was one of the EU's main rice suppliers.   Thus, any contamination in the US long-grain rice supply is

financially devastating to entities in the EU receiving rice from the U.S. such as Tilda.

## U.S. Regulation of Genetically Modified Crops

24.   In 1986, the United States Federal Government published a policy document known as the Coordinated Framework for the Regulation of Biotechnology. Pursuant to this framework, the United States Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS"), the Food and Drug Administration ("FDA"), and the U.S. Environmental Protection Agency ("EPA") share responsibility for regulating biotechnology products to ensure that approved products developed in the United States pose no risk to human health or the environment.

25.   Under the authority of the Plant Protection Act, APHIS's Biotechnology Regulatory Services ("BRS") regulates the introduction of genetically engineered organisms in the United States.

26.   The BRS refers to genetically engineered organisms as "regulated articles."  "Regulated articles" are organisms that have been altered by or produced through genetic engineering and have the potential to be "plant pests," which means they pose a direct or indirect risk to other plants or plant products.

27.   APHIS exercises its regulatory authority through a system of permits and notifications.  A developer wishing to introduce a genetically engineered organism must obtain the necessary authorization before proceeding and must submit all plans for movement, importation, or field testing for thorough review by BRS's regulatory scientists.

28.   Most genetically engineered plants are regulated under the notification

process. The notification process applies to plants that are genetically engineered to be resistant to certain herbicides.

### Defendants' Experimentation with LLRICE 601

29.    LLRICE 601 (also referred to as "Liberty Link Rice") is a type of genetically engineered ("GE") rice seed experimentally tested by Bayer. LLRICE 601 is an experimental variety of long-grain rice that has been genetically altered with a bacterial gene that causes the crop to produce a protein that makes it resistant to Liberty® Herbicide (also known as glufosinate), which is produced by Bayer.

30.    LLRICE 601 was subject to the notification process because it was genetically engineered to be resistant to Liberty® Herbicide.

31.    As a bio-engineered product, LLRICE 601 was subject to regulatory approval prior to commercialization. LLRICE 601 was not deregulated by APHIS until November 24, 2006. At the time of its delivery to Tilda, LLRICE 601 had not been approved for human consumption.

32.    LLRICE 601 was grown in field tests from 1998 to 2001. Bayer never sought to market the rice commercially largely because of warnings from millers and processors as well as domestic and foreign producers that they would reject it.

33.    On May 22, 2001, the Houston Chronicle reported that nearly 5 million pounds of genetically modified rice developed by the Bayer Defendants' predecessor, Aventis CropScience, were being hauled away from a Brazoria County, Texas farm to a landfill for burial. This rice could have been marketed for human consumption had it remained in storage bins until the EPA granted approval, but according to a company

spokesperson, Aventis wanted to be sure it could properly manage the experimental crop and track its location. The Houston Chronicle reported that 250,000 pounds of the rice, which was harvested in August 2000, would be retained for Aventis to use for testing while the rest, about 4.75 million pounds, would be buried.

### Discovery of Contamination of U.S. Rice Supply by LLRICE 601

34.     On August 18, 2006, Secretary of Agriculture and head of the USDA, Secretary Mike Johanns announced that unapproved rice had been found in supplies destined for human consumption.

35.     On August 18, 2006, the USDA released a statement from Secretary Mike Johanns as well as a Fact Sheet, Release No. 0306.06, which was also posted on the USDA website at http://www.usda.gov.  The USDA announced that Bayer had notified the USDA and the FDA that trace amounts of the GE rice LLRICE 601 had been detected in samples taken from commercial long grain rice.  Bayer had previously indicated that it had no plans to market LLRICE 601 and therefore had not requested deregulation.  The USDA stated that "[b]ased on reports that LLRICE 601 is in the marketplace and a petition from Bayer, APHIS will conduct a deregulation process, including an opportunity for public comment."  The USDA further reported that, because LLRICE 601 was regulated, "APHIS is conducting an investigation to determine the circumstances surrounding the release and whether any violations of USDA regulations occurred."

36.     Also on August 18, 2006, Riceland Foods, a farmer-owned cooperative based in Stuttgart, Arkansas, issued its own "Statement Regarding Genetically

Engineered Material in Rice." Riceland Stated that a "significant number" of samples from its five-state growing region - Arkansas, Missouri, Mississippi, Louisiana and Texas - had tested positive for the Bayer genetically engineered trait contained in LLRICE 601.

37.    Agriculture Department officials later said that genetically engineered rice had been found in bins in Arkansas in Missouri that held rice from the 2005 crop, though the rice in those bins might have come from other states.

38.    Riceland also said the existence of a genetically engineered product in its rice had been discovered in January 2006 by one of its export customers. Riceland has stated that it will not reveal the identity of this export customer. Riceland said that because genetically engineered rice was not grown commercially in the US, it initially thought that a small amount of genetically engineered corn or another crop had been mixed in with rice, perhaps through the use of a common means of transportation. But Riceland said that in May the company collected rice samples from several geographically-dispersed grain storage sites and found positive results for the Bayer trait. Riceland said it then "became suspicious that the discovery was a Bayer genetically engineered event in rice," and provided a sample to Bayer for an explanation of the results. Bayer confirmed the findings and said, based upon the sample it received, that the modified rice was present at levels equivalent to 6 of every 10,000 grains. Bayer did not report these findings to the US government until July 31, 2006. Even under the above-stated suspicions, Riceland continued to export rice to the European Union and companies such as Tilda with the knowledge of the European Union's explicit ban on the importation and sale of genetically engineered rice. In

particular, Riceland did not inform Tilda of its suspicions that its rice had become contaminated or that it had been informed by a customer of the contamination and that it had undertaken any testing of samples, contacted Bayer in May, and supplied Bayer with a sample for Bayer to test. On the contrary, Riceland remained silent and entered into contracts to sell further quantities of rice to Tilda.

39.     On August 23, 2006, the EU ordered special certifications for imports of rice from the United States to keep out genetically contaminated long-grain rice. Under the new rules, the United States will have to specifically certify that US rice shipments to the EU are free from the contamination of Bayer's genetically engineered rice.

40.     On August 24, 2006, a consignment of rice landed at Rotterdam, Holland on the vessel Hickory 38. This shipment included rice which had been purchased by Tilda. Testing of this shipment revealed a significant level of contamination of the rice with LLRICE 601 to such an extent that the EU required that none of the rice from the Hickory 38 was permitted into the EU without it being tested as negative for LLRICE 601. On September 12, 2006, the Associated Press reported that tests by the European Commission on three barges containing rice from the United States had tested positive for LLRICE 601. A portion of the contaminated rice had been purchased by Tilda. EU officials stated that consignments found to contain illegal strains either are being destroyed or are being returned to the United States. Consequently, Tilda was not able to take delivery of the rice that it had purchased.

### Defendants' Wrongful Conduct
### that Led to Contamination of the U.S. Rice Market

41.     At the time they were testing LLRICE 601 through the present day, Bayer

knew that non-GE rice could become contaminated with LLRICE 601 through a wide variety of means including cross-pollination and commingling during harvest, storage, transport and disposal.

42.     In testing, growing, transporting, storing and disposing of LLRICE 601, Bayer failed to comply with responsible practices.  Bayer knew or should have known that it was impossible to completely isolate LLRICE 601 rice from other varieties of rice and that LLRICE 601 would inevitably cross-pollinate with other rice plants. Furthermore, Bayer was aware, or should have been aware, that unless strict precautionary measures could be implemented at all levels - from the farm through distribution, transportation, storage and disposal chain - given the nature of the U.S. grain handling system - LLRICE 601 would contaminate the entire U.S. rice crop and infiltrate the general U.S. rice supply and ultimately the supply of rice exported to foreign countries including the EU.

43.     Bayer failed to take all reasonable and necessary steps to prevent cross-pollination with non-GE rice.  Additionally or alternatively, Bayer knew, or should have known, before they grew or otherwise disseminated LLRICE 601 rice seed, that such cross-pollination could not be prevented.

44.     Bayer also failed to take the necessary steps to prevent commingling of LLRICE 601 rice with non-GE rice during planting, harvest, handling, storage, transport and disposal.  Additionally or alternatively, Bayer knew, or should have known, before it grew or otherwise disseminated LLRICE 601 rice seed, that the U.S. rice production and marketing chain is a commodity-based system that gathers, commingles, and ships rice

14

from hundreds of thousands of farms through local, regional, and terminal elevators and that widespread commingling of LLRICE 601 rice with non-GE rice would likely occur.

45.    Bayer was or should have been aware of these concerns regarding the health and safety of biotech aspects of products such as LLRICE 601 and the potential detrimental effects arising therefrom.

46.    This widespread LLRICE 601 cross-pollination and contamination has had a broad and adverse impact on Tilda.  The Defendants' wrongful conduct has rendered hundreds of thousands of bushels of American rice sold to Tilda suspect for GE contamination and valueless.

47.    Bayer knew, or should have known, that once LLRICE 601 became commingled with the general US rice supply, identity determination and segregation of the entire US rice supply would be required in order to prevent LLRICE 601 rice from entering the domestic and international food supply channels and that such a situation would involve huge disruptions in the rice trade and would impose significant added costs to persons or entities such as Tilda who receive such rice from U.S. exporters such as Riceland and Producers.

48.    Despite these facts, Bayer grew and tested LLRICE 601 product without implementing adequate safeguards to prevent its release into the general rice market. Bayer failed to adequately instruct, oversee or control test growers to ensure that LLRICE 601 crops were adequately segregated or contained adequate buffer zones.

49.    In receiving, selling and ultimately exporting rice produced within the United States, Riceland and Producers failed to take the necessary steps to prevent the

shipment of GE rice, including LLRICE 601, to its customers within the United States and throughout the world.

50.     Despite these facts, Riceland and Producers contracted to sell and sold rice to entities such as Tilda without implementing the proper safeguards to prevent the export of GE contaminated rice into markets such as the EU when Riceland knew that such export was prohibited.

### Detrimental effects of Defendants' wrongful conduct on Tilda, Ltd.

51.     Bayer's wrongful conduct directly led to the unlawful introduction of contaminated rice into the European Union consumer market.

52.     Riceland's wrongful conduct directly led to the introduction of contaminated rice into the European Union consumer market.

53.     Producers' wrongful conduct directly led to the introduction of contaminated rice into the European Union consumer market.

54.     As a result of LLRICE 601's unapproved presence in a wide range of rice crops in the United States, and further, as a result of the fact that LLRICE 601 has been found in rice destined for export markets, rice exported from the United States has been severely restricted in the EU, and confidence in the integrity and safety of America's rice crop has evaporated in that market, which was formerly a large market for US rice exports. All of these factors have caused Tilda to sustain damages in the form of lost profits, loss of business reputation, loss of value of inventory, expensive recall campaigns, and will cause Tilda to incur lost profits and loss of business reputation in the future.

55.    Due to the Defendants' wrongful conduct, US rice destined for export markets for use in food products has been determined to have been contaminated with LLRICE 601 rice and has been rejected for the purpose(s) for which it was intended and/or rendered valueless – thereby detrimentally impacting and damaging Tilda, Ltd.

56.    As a result of Defendants' wrongful conduct, the EU has prohibited all US rice imports unless they have been scientifically tested and found not to contain GE contaminated rice.  The EU now requires mandatory testing of all US rice imports into EU ports.

57.    Additionally, many EU food producers and other large commercial purchasers of Tilda's rice have rejected or will likely reject Tilda's rice out of concern that Tilda's rice supply has been contaminated by LLRICE 601.

58.    The introduction of LLRICE 601 rice into the EU as a result of Defendants' wrongful conduct has detrimentally affected the ability of Tilda to procure the rice supplies that are necessary for it to carry on its business.  As a result of Defendants' wrongful conduct, Tilda has been and will in the future be required to look to sources other than the U.S. for its rice requirements, and, as a result, Tilda has incurred and will incur additional costs in procuring its rice requirements.

59.    As a result of Defendants' wrongful conduct, Tilda was prohibited from utilizing its current rice stock pending the expensive and now required testing required by EU regulating authorities.  If any required testing indicates a contamination with GE rice, Tilda will be forced to dispose of hundreds of thousands of dollars worth of rice stock that it is unable to sell.

17

### Count I - Breach of Contract

60.    Tilda realleges and reincorporates paragraphs 1 through 59 set forth above as if fully set forth herein.

61.    On numerous occasions, Riceland contracted to sell and export long-grain rice to Tilda for delivery into the EU.

62.    By virtue of the course of dealings between Riceland and Tilda, Riceland knew that it was contracting to deliver rice to Tilda for processing and ultimate resale within the EU, and Riceland knew that the importation of GE contaminated rice into the EU was illegal and strictly prohibited.  Pursuant to the agreement between Tilda and Riceland, rice delivered by Riceland to Tilda is delivered C&F Rotterdam; Riceland is responsible for freight.

63.    Tilda performed all of its obligations under its contracts with Riceland.

64.    Riceland breached its contracts with Tilda by delivering GE contaminated rice to Tilda.

65.    As a direct result of Riceland's breach of contract, Tilda has suffered damages in an amount to be decided by a jury herein but in an amount in excess of $75,000.00.

66.    Tilda is entitled by law to recover from Riceland the damages sustained by Tilda as a result of Riceland's breach of contract in an amount to be decided by the trier of fact herein, plus pre- and post-judgment interest at the highest rate allowed by law.

67.    Pursuant to Ark. Code Ann. § 16-22-308, Tilda is also entitled to recover its reasonable costs and attorney's fees incurred herein.

## Count II - Breach of Contract

68.    Tilda realleges and reincorporates paragraphs 1 through 67 set forth above as if fully set forth herein.

69.    Pursuant to contracts entered into between Riceland and Tilda, Riceland agreed to deliver a certain quantity of long grain rice to Tilda for delivery in the EU.

70.    Tilda performed all of its obligations under its contracts with Riceland.

71.    Upon delivery of said long grain rice to Tilda, Tilda notified Riceland of its rejection of said rice in accordance with the terms of the contracts between Riceland and Tilda as a result of said rice being contaminated with GE rice.

72.    Riceland has refused to accept Tilda's rejection of said rice and has refused to reimburse Tilda for the price paid by Tilda for said rejected rice.

73.    Riceland's refusal to accept Tilda's rejection of said rice and refusal to reimburse Tilda for said rejected rice constitutes a breach of contract by Riceland, and, as a result of Riceland's breach of contract, Tilda is entitled to recover its damages from Riceland pursuant to Article 2 of the Uniform Commerical Code, plus pre- and post-judgment interest at the highest rate allowed by law.

74.    Pursuant to Ark. Code Ann. § 16-22-308, Tilda is also entitled to recover its reasonable costs and attorney's fees incurred herein.

## Count III - Breach of Contract

75.    Tilda realleges and reincorporates paragraphs 1 through 74 set forth above as if fully set forth herein.

76.    On numerous occasions, Producers contracted to sell and export long-

19

grain rice to Tilda for delivery into the EU.

77.    By virtue of the course of dealings between Producers and Tilda,
Producers knew that it was contracting to deliver rice to Tilda for processing and ultimate
resale within the EU, and Producers knew that the importation of GE contaminated rice
into the EU was illegal and strictly prohibited.    Additionally, Producers expressly
contracted to provide Tilda with rice that had not been genetically modified.    Pursuant to
the agreement between Tilda and Producers, rice delivered by Producers to Tilda is
delivered C&F Rotterdam; Producers is responsible for freight.

78.    Tilda performed all of its obligations under its contracts with Producers.

79.    Producers breached its contracts with Tilda by delivering GE contaminated
rice to Tilda.

80.    As a direct result of Producers' breach of contract, Tilda has suffered
damages in an amount to be decided by a jury herein but in an amount in excess of
$75,000.00.

81.    Tilda is entitled by law to recover from Producers the damages sustained
by Tilda as a result of Producers's breach of contract in an amount to be decided by the
trier of fact herein, plus pre- and post-judgment interest at the highest rate allowed by
law.

82.    Pursuant to Ark. Code Ann. § 16-22-308, Tilda is also entitled to recover
its reasonable costs and attorney's fees incurred herein.

### Count IV - Breach of Express Warranty

83.    Tilda realleges and reincorporates paragraphs 1 through 82 set forth

above as if fully set forth herein.

84.     Prior to Tilda's purchase of the rice as alleged herein, Riceland induced

Tilda's rice purchases by making express warranties, representations, promises and

descriptions to Tilda about the rice Riceland would supply to Tilda.

85.     In purchasing the rice as alleged herein, Tilda relied upon the skill and

judgment of Riceland and Riceland's express warranties to provide Tilda with GE-free

rice.

86.     Under Ark. Code Ann. § 4-2-313, the written and oral statements, promises

and descriptions made by Riceland as the seller to Tilda regarding the rice provided to

Tilda by Riceland constitute express warranties and became part of the basis of the

bargain, creating an express warranty that said goods would conform to Riceland's

promises, descriptions and affirmations of fact.

87.     Riceland's express warranties explicitly extended to future shipments of

rice provided to Tilda.

88.     Riceland breached its express warranties, and Tilda has suffered damages

due to Riceland's breach of express warranty.


### Count V - Breach of Express Warranty

89.     Tilda realleges and reincorporates paragraphs 1 through 88 set forth

above as if fully set forth herein.

90.     Prior to Tilda's purchase of the rice as alleged herein, Producers induced

Tilda's rice purchases by making express warranties, representations, promises and

21

descriptions to Tilda about the rice Producers would supply to Tilda.

91.     In purchasing the rice as alleged herein, Tilda relied upon the skill and judgment of Producers and Producers' express warranties to provide Tilda with GE-free rice.

92.     Under Ark. Code Ann. § 4-2-313, the written and oral statements, promises and descriptions made by Producers as the seller to Tilda regarding the rice provided to Tilda by Producers constitute express warranties and became part of the basis of the bargain, creating an express warranty that said goods would conform to Producers' promises, descriptions and affirmations of fact.

93.     Producers' express warranties explicitly extended to future shipments of rice provided to Tilda.

94.     Producers breached its express warranties, and Tilda has suffered damages due to Producers' breach of express warranty.

## Count VI - Breach of Implied Warranty of Fitness for Particular Purpose

95.     Tilda realleges and reincorporates paragraphs 1 through 94 set forth above as if fully set forth herein.

96.     At the time of each sale of rice as alleged herein, Riceland had reason to know and, in fact, did know of the particular purpose for which Tilda purchased rice from Riceland and knew that Tilda as buyer was relying upon Riceland's skill and judgment to furnish Tilda with GE-free rice that would meet its needs, including Tilda's obligations under applicable EU regulations.

97.     Riceland breached its implied warranty of fitness for particular purpose by

22

supplying Tilda with GE-contaminated rice that, as supplied by Riceland, was not suitable for the particular purpose for which it was intended and did not comply with all applicable U.S. and EU regulations.

98.    As a result of Riceland's breach of implied warranty of fitness for particular purpose, Tilda has suffered damages as described herein.

### Count VII - Breach of Implied Warranty of Fitness for Particular Purpose

99.    Tilda realleges and reincorporates paragraphs 1 through 91 set forth above as if fully set forth herein.

100.    At the time of each sale of rice as alleged herein, Producers had reason to know and, in fact, did know of the particular purpose for which Tilda purchased rice from Producers and knew that Tilda as buyer was relying upon Producers' skill and judgment to furnish Tilda with GE-free rice that would meet its needs, including Tilda's obligations under applicable EU regulations.

101.    Producers breached its implied warranty of fitness for particular purpose by supplying Tilda with GE-contaminated rice that, as supplied by Producers, was not suitable for the particular purpose for which it was intended and did not comply with all applicable U.S. and EU regulations.

102.    As a result of Producers' breach of implied warranty of fitness for particular purpose, Tilda has suffered damages as described herein.

### Count VIII - Breach of Implied Warranty of Merchantability

103.    Tilda realleges and reincorporates paragraphs 1 through 102 set forth above as if fully set forth herein.

104.   Riceland impliedly warranted that the rice that it supplied to Tilda was fit for introduction and subsequent sale and processing within the EU, the purpose for which it was purchased by Tilda, and that it was fit and suitable for Tilda's intended use.

105.   In purchasing and using the rice supplied by Riceland, Tilda relied on Riceland's skill, judgment and implied warranty of merchantability.

106.   The rice supplied to Tilda by Riceland was not fit for use for its intended purpose and, as a result of Riceland's breach of implied warranty of merchantability, Tilda sustained damages as described herein.

107.   Tilda provided Riceland with written notice of its breach as described herein above.

### Count IX - Breach of Implied Warranty of Merchantability

108.   Tilda realleges and reincorporates paragraphs 1 through 107 set forth above as if fully set forth herein.

109.   Producers impliedly warranted that the rice that it supplied to Tilda was fit for introduction and subsequent sale and processing within the EU, the purpose for which it was purchased by Tilda, and that it was fit and suitable for Tilda's intended use.

110.   In purchasing and using the rice supplied by Producers, Tilda relied on Producers' skill, judgment and implied warranty of merchantability.

111.   The rice supplied to Tilda by Producers was not fit for use for its intended purpose and, as a result of Producers' breach of implied warranty of merchantability, Tilda sustained damages as described herein.

112.   Tilda provided Producers with written notice of its breach as described

herein above.

### Count X - Negligence

113.    Tilda realleges and reincorporates paragraphs 1 through 112 set forth above as if fully set forth herein.

114.    Riceland was negligent in its provision of GE contaminated rice to Tilda and in its failure to take reasonable precautions to prevent and safeguard against the provision of GE contaminated rice to Tilda, which it had a duty to do.

115.    As a result of Riceland's negligence, Tilda has suffered damages, as stated previously herein, in an amount to be determined by a jury but in an amount in excess of $75,000.00.

116.    The damages suffered by Tilda as stated herein were directly and proximately caused by the negligence of Riceland.

117.    Tilda is entitled to recover from Riceland the damages stated herein, which were caused as a result of the negligence of Riceland.

118.    Tilda further seeks punitive/exemplary damages from Riceland because Riceland was on notice as early as January of 2006, that one of its customers in the EU, whose identity Riceland refuses to disclose, had received GE contaminated rice from Riceland, and Riceland knew or ought to have known in light of the surrounding circumstances that it's conduct in providing rice to Tilda after January of 2006, without taking reasonable precautions to prevent the provision of GE contaminated rice would naturally and probably result in damages to Tilda, and Riceland proceeded with such conduct in reckless disregard of the consequences.  Such punitive damages are sought

by Tilda in order to make an example of Riceland and to deter others who might otherwise act with such conscious indifference as Riceland did.

## Count XI - Negligence

119.   Tilda realleges and reincorporates paragraphs 1 through 118 set forth above as if fully set forth herein.

120.   Producers was negligent in its provision of GE contaminated rice to Tilda and in its failure to take reasonable precautions to prevent and safeguard against the provision of GE contaminated rice to Tilda, which it had a duty to do.

121.   As a result of Producers' negligence, Tilda has suffered damages, as stated previously herein, in an amount to be determined by a jury but in an amount in excess of $75,000.00.

122.   The damages suffered by Tilda as stated herein were directly and proximately caused by the negligence of Producers.

123.   Tilda is entitled to recover from Producers the damages which were caused as a result of the negligence of Producers.


## Count XII - Strict Product Liability

124.   Tilda realleges and reincorporates paragraphs 1 through 123 set forth above as if fully set forth herein.

125.   Riceland is engaged in the business of selling rice.

126.   Riceland sold to Tilda a rice product contaminated with LLRICE 601, a defective and unreasonably dangerous product that is not fit or approved by U.S. or EU

governmental authorities for human consumption.

127.   Tilda was unaware that the rice sold to it by Riceland contained LLRICE 601.

128.   Exercise of reasonable care could not have rendered Riceland's provision of LLRICE 601 to Tilda safe.

129.   As a result of Riceland's sale to Tilda of a rice product contaminated with LLRICE 601, Tilda has suffered damages, as stated previously herein, in an amount in excess of $75,000.00, which Tilda is entitled to recover from Riceland.

130.   Tilda further seeks punitive/exemplary damages from Riceland because Riceland was on notice as early as January of 2006, that one of its customers in the EU, whose identity Riceland refuses to disclose, had received GE contaminated rice from Riceland, and Riceland knew or ought to have known in light of the surrounding circumstances that it's conduct in providing rice to Tilda after January of 2006, without taking reasonable precautions to prevent the provision of GE contaminated rice would naturally and probably result in damages to Tilda, and Riceland proceeded with such conduct in reckless disregard of the consequences.  Such punitive damages are sought by Tilda in order to make an example of Riceland and to deter others who might otherwise act with such conscious indifference as Riceland did.

## Count XIII - Strict Product Liability

131.   Tilda realleges and reincorporates paragraphs 1 through 130 set forth above as if fully set forth herein.

132.   Producers is engaged in the business of selling rice.

27

133.   Producers sold to Tilda a rice product contaminated with LLRICE 601, a defective and unreasonably dangerous product that is not fit or approved by U.S. or EU governmental authorities for human consumption.

134.   Tilda was unaware that the rice sold to it by Producers contained LLRICE 601.

135.   Exercise of reasonable care could not have rendered Producers' provision of LLRICE 601 to Tilda safe.

136.   As a result of Producers' sale to Tilda of a rice product contaminated with LLRICE 601, Tilda has suffered damages, as stated previously herein, in an amount in excess of $75,000.00, which Tilda is entitled to recover from Producers.

### Count XIV - Violation of Arkansas Deceptive Trade Practices Act

137.   Tilda realleges and reincorporates paragraphs 1 through 136 set forth above as if fully set forth herein.

138.   Riceland induced Tilda to purchase rice from it by purposely misrepresenting that the rice provided to Tilda by Riceland would be free of any GE contaminant.

139.   Riceland fraudulently and intentionally induced Tilda to purchase rice from it, and Riceland failed to provide Tilda with rice free of any GE contaminant.

140.   Tilda justifiably relied on the statements and representations of Riceland in agreeing to purchase rice from Riceland.

141.   Riceland's actions constitute violations of the Arkansas Deceptive Trade Practices Act ("DTPA"), which makes it unlawful for any person to engage "in any ...

unconscionable, false, or deceptive act or practice in business, commerce, or trade."

142.    As a direct and proximate result of Riceland's violations of the DTPA, Tilda has suffered actual damages in an amount to be determined by a jury but in an amount greater than $75,000.00

143.    Tilda is additionally entitled to an award of its reasonable attorneys' fees incurred herein as a result of Riceland's violations of the DTPA.

### Count XV - Violation of Arkansas Deceptive Trade Practices Act

144.    Tilda realleges and reincorporates paragraphs 1 through 136 set forth above as if fully set forth herein.

145.    Producers induced Tilda to purchase rice from it by purposely misrepresenting that the rice provided to Tilda by Producers would be free of any GE contaminant.

146.    Producers fraudulently and intentionally induced Tilda to purchase rice from it, and Producers failed to provide Tilda with rice free of any GE contaminant.

147.    Tilda justifiably relied on the statements and representations of Producers in agreeing to purchase rice from Producers.

148.    Producers' actions constitute violations of the Arkansas Deceptive Trade Practices Act ("DTPA"), which makes it unlawful for any person to engage "in any ... unconscionable, false, or deceptive act or practice in business, commerce, or trade."

149.    As a direct and proximate result of Producers' violations of the DTPA, Tilda has suffered actual damages in an amount to be determined by a jury but in an amount greater than $75,000.00

150.   Tilda is additionally entitled to an award of its reasonable attorneys' fees incurred herein as a result of Producers' violations of the DTPA.

### Count XVI - Fraud

151.   Tilda realleges and reincorporates paragraphs 1 through 150 set forth above as if fully set forth herein.

152.   In order to induce Tilda to purchase rice from it Riceland fraudulently concealed the existence of GE contaminants in the rice provided to Tilda and falsely represented that such rice did not contain GE contaminants.

153.   Riceland had reason to know that its representations made to Tilda were false at the time that they were made, and Riceland made such false representations in order to induce Tilda to purchase rice from it.

154.   Tilda justifiably relied upon Riceland's representations to its detriment.

155.   As a direct and proximate result of the false and fraudulent misrepresentations of Riceland, Tilda has suffered damages in an amount to be determined by a jury but in an amount greater than $75,000.00.

156.   Tilda further seeks punitive/exemplary damages from Riceland because Riceland was on notice as early as January of 2006, that one of its customers in the EU, whose identity Riceland refuses to disclose, had received GE contaminated rice from Riceland, and Riceland knew or ought to have known in light of the surrounding circumstances that it's conduct in providing rice to Tilda after January of 2006, without taking reasonable precautions to prevent the provision of GE contaminated rice would naturally and probably result in damages to Tilda, and Riceland proceeded with such

30

conduct in reckless disregard of the consequences. Such punitive damages are sought by Tilda in order to make an example of Riceland and to deter others who might otherwise act with such conscious indifference as Riceland did.

### Count XVII - Conversion

157.   Tilda realleges and reincorporates paragraphs 1 through 156 set forth above as if fully set forth herein.

158.   Tilda was the owner of rice supplies which had been accumulated and stored by Tilda prior to August of 2006.

159.   Riceland, through its intentional conduct and/or through its extreme recklessness amounting to intentional conduct caused the contamination of Tilda's rice supplies by selling and delivering to Tilda GE contaminated rice.

160.   By virtue of the foregoing, Riceland, though its intentional conduct and/or through its extreme recklessness amounting to intentional conduct, materially altered the physical condition of Tilda's rice supplies as to change its identity and/or character; and/or constructively exercised control and dominion over the rice supplies of Tilda.

161.   As a direct and proximate result of the foregoing, the value of Tilda's rice supplies has been or will be substantially diminished and/or destroyed.

162.   As a result of the foregoing, Riceland is liable to Tilda for conversion.

163.   The conduct of Riceland showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

31

## Count XVIII - Conversion

164.    Tilda realleges and reincorporates paragraphs 1 through 163 set forth above as if fully set forth herein.

165.    Tilda was the owner of rice supplies which had been accumulated and stored by Tilda prior to August of 2006.

166.    Producers, through its intentional conduct and/or through its extreme recklessness amounting to intentional conduct caused the contamination of Tilda's rice supplies by selling and delivering to Tilda GE contaminated rice.

167.    By virtue of the foregoing, Producers, though its intentional conduct and/or through its extreme recklessness amounting to intentional conduct, materially altered the physical condition of Tilda's rice supplies as to change its identity and/or character; and/or constructively exercised control and dominion over the rice supplies of Tilda.

168.    As a direct and proximate result of the foregoing, the value of Tilda's rice supplies has been or will be substantially diminished and/or destroyed.

169.    As a result of the foregoing, Producers is liable to Tilda for conversion.


## Count XIX - Negligence

170.    Tilda realleges and reincorporates paragraphs 1 through 169 set forth above as if fully set forth herein.

171.    With respect to its testing, storing, transporting and disposing of LLRICE 601, Bayer had a duty to exercise that degree of skill and learning ordinarily used under the same or similar circumstances by an expert in Bayer's business.

172.   As set forth above, Bayer breached this duty by failing to exercise the requisite degree of care in testing, storing, growing, transporting and disposing of LLRICE 601 to prevent it from contaminating neighboring crops and the US rice supply.

173.   Also, as set forth above, Bayer breached this duty by failing to notify the USDA and the public in a timely fashion after it first learned of the contamination.

174.   Such breaches are a direct and proximate cause of the damages set forth above suffered by Tilda.

175.   With respect to the damages sustained by Tilda as described herein, Tilda states, in the alternative, that such contamination of the US rice supply would not ordinarily occur absent negligence; Bayer had the exclusive care, custody and control of the genetically engineered LLRICE 601 and inasmuch as Bayer is in a superior position to Tilda to know or have means of explaining the course or reason for such occurrence, Bayer is presumed negligent under the doctrine of res ipsa loquitor.

176.   The conduct of Bayer showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

### Count XX - Absolute Liability – Ultrahazardous Activity

177.   Tilda realleges and reincorporates paragraphs 1 through 176 set forth above as if fully set forth herein.

178.   The development, growing, transporting and storing of GE rice, including LLRICE 601, constituted and continues to constitute an abnormally dangerous activity or ultra hazardous activity.  Because such activities create a high degree of risk of harm,

the harm has been and will be significant, the risk cannot be eliminated, and the harm outweighs the value of the activity.  In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

179.   The type of harm suffered by Tilda as stated herein is the kind of harm the possibility of which makes the activity abnormally dangerous.

180.   Bayer is thus strictly liable to Tilda for all damages which have been caused or will be caused to Tilda as a result of the release of LLRICE 601 into the environment and into the US rice supply.

181.   The development, growing, transporting, and storing of LLRICE 601 by Bayer has directly and proximately caused the release and dissemination of LLRICE 601 into the US rice supply, a portion of which was delivered to Tilda, resulting in damages to Tilda, as set forth herein.

182.   As a direct and proximate result of the introduction of LLRICE 601 into the environment and into the US rice supply, for which Bayer is liable, Tilda has suffered, presently suffers, and will continue to suffer in the future, damages and losses as described herein.

183.   The conduct of Bayer showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

### Count XXI - Strict Liability - Products Liability

184.   Tilda realleges and reincorporates paragraphs 1 through 183 set forth above as if fully set forth herein.

34

185.   As set forth above, LLRICE 601 rice was a defective and unreasonably dangerous product when put to a foreseeable or reasonably anticipated use.

186.   The testing, growing, storing, transporting and disposal of LLRICE 601 rice has resulted in the contamination of the US grain production and handling system, causing export markets to restrict, or ban altogether, importation of US rice.

187.   The LLRICE 601 was used in a manner reasonably anticipated and/or foreseen.

188.   The testing, growing, storing, transporting and disposal of agricultural seeds not approved for human consumption by Bayer has caused unprecedented damage to Tilda.

189.   Given the structure and operation of the US grain production and handling system, the testing, growing, storing, transporting and disposing of LLRICE 601 by Bayer was improper.

190.   Any benefit derived from the test cultivation of LLRICE 601 is greatly outweighed by the harms resulting from LLRICE 601 contamination of the US rice supply and Tilda's rice supplies.

191.   As a direct and proximate result of the defective and unreasonably dangerous condition of the LLRICE 601 as it existed when it was in or left the control of Bayer, Tilda has suffered the damages set forth above.

192.   The conduct of Bayer showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

35

## Count XXII - Conversion

193. Tilda realleges and reincorporates paragraphs 1 through 192 set forth above as if fully set forth herein.

194. Tilda was the owner of rice supplies which had been accumulated and stored by Tilda prior to August of 2006.

195. Bayer through its intentional conduct and/or through its extreme recklessness amounting to intentional conduct caused the contamination of Tilda's rice supplies by selling and delivering to Tilda GE contaminated rice.

196. By virtue of the foregoing, Bayer, though its intentional conduct and/or through its extreme recklessness amounting to intentional conduct, materially altered the physical condition of Tilda's rice supplies as to change its identity and/or character; and/or constructively exercised control and dominion over the rice supplies of Tilda.

197. As a direct and proximate result of the foregoing, the value of Tilda's rice supplies has been or will be substantially diminished and/or destroyed.

198. As a result of the foregoing, Bayer is liable to Tilda for conversion.

199. The conduct of Bayer showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

## Count XXIII - Public Nuisance

200. Tilda realleges and reincorporates paragraphs 1 through 199 set forth above as if fully set forth herein.

201. Bayer has created a public nuisance by causing widespread contamination

of rice in the United States with LLRICE 601 rice, and consequent contamination of rice supplies in markets such as the EU, which constitutes an unreasonable and significant interference with rights common to the general public, including that the food supply not be contaminated by rice not properly approved for human consumption and that U. S. food exports not be suspect and devalued because of concerns of contamination by genetically modified organisms.

202.   This substantial interference is imposed on the community at large and on a considerable and diverse number of persons. It arises from: (a) the testing, growing, storing, transporting and disposing of LLRICE 601 by Bayer without adequate precautions to prevent contamination; and/or (b) the testing, growing, storing, transporting, and disposing of LLRICE 601 by Bayer with the knowledge that it would contaminate rice by cross-pollination and commingling; and/or (c) the testing, growing, storing, transporting and disposing of LLRICE 601 by Bayer with the knowledge that LLRICE 601 would likely contaminate the human food supply.

203.   This interference is unreasonable in that it involves significant interference with the public health, the public safety, the public peace, the public comfort and/or the public convenience. It also is unreasonable in that it is proscribed by federal and state law, is of a continuing nature, and has produced a permanent or long-lasting effect.

204.   Tilda has suffered injury from the public nuisance created by Bayer distinct from and different than that suffered by the general public in that, as described above, it suffers business losses in the form of lost profits, loss of business reputation, loss of value of its supplies, expensive recall campaigns, and contamination of its property.

37

205. The conduct of Bayer stated herein showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

### Count XIV - Negligence Per Se - Violation of 7 C.F.R. 340

206. Tilda realleges and reincorporates paragraphs 1 through 205 set forth above as if fully set forth herein.

207. Bayer, between 1998 and 2001, conducted field trials of LLRICE 601, the "regulated article," as defined by 7 CFR Part 340.1.

208. Under 7 CFR Part 340.0(a)(2), no "person" shall "introduce" a "regulated article" unless such introduction "is in conformity with all other applicable restrictions in this part."

209. 7 CFR Part 340.1 defines "introduce" to mean "[t]o move in or through the United States, to release into the environment, to move interstate, or any attempt there at."

210. The "applicable restrictions" for "regulated articles" "introduced" in the United States include the following:

(1)     If the plants or plant materials are shipped, they must be shipped in such a way that the viable plant material is unlikely to be disseminated while in transit and must be maintained at the destination facility in such a way that there is no release into the environment.

(2)     When the introduction is an environmental release, the regulated article must be planted in such a way that they are not inadvertently mixed with non-regulated plant materials of any species which are not part of the environmental release.

(3)     The plants and plant parts must be maintained in such a way that the identity of all material is known while it is in use, and the plant parts must

be contained or devitalized when no longer in use.

(4)    There must be no viable vector agent associated with the regulated article.

(5)    The field trial must be conducted such that:
(i)The regulated article will not persist in the environment, and
(ii) No offspring can be produced that could persist in the environment.

(6)    Upon termination of the field test:
(i) No viable material shall remain which is likely to volunteer in subsequent seasons, or
(ii) Volunteers shall be managed to prevent persistence in the environment.

7 CFR Part 340.3(c).

211.    Pursuant to 7 CFR Part 340.3(c), and at all times prior to November 24, 2006, Bayer had regulatory duties to Tilda to test, grow, store, transport and dispose of LLRICE 601 in a manner that would not result in contamination of the rice market prior to regulatory approval.

212.    Bayer breached these duties by testing, growing, storing, transporting and disposing of LLRICE 601 in violation of these standards.

213.    Such breaches are the direct and proximate causes of the damages suffered by Tilda as stated herein

214.    As a direct and proximate result of the breaches of Bayer, Tilda has suffered damages as stated herein.

215.    The conduct of Bayer showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

### Count XV - Negligence Per Se - Violation of 7 C.F.R. 340

216.   Tilda realleges and reincorporates paragraphs 1 through 215 set forth above as if fully set forth herein.

217.   Riceland and Producers, prior to November 24, 2006, shipped LLRICE 601, a "regulated article" as defined by 7 CFR Part 340.1, to its customers, including Tilda.

218.   Under 7 CFR Part 340.0(a)(2), no person shall introduce a "regulated article" unless such introduction is in conformity with all other applicable restrictions in this part.

219.   7 CFR Part 340.1 defines "introduce" to mean "[t]o move in or through the United States, to release into the environment, to move interstate, or any attempt there at."

220.   Pursuant to 7 CFR Part 340.0, et seq., and at all times prior to November 24, 2006, Riceland and Producers had a regulatory duty to notify the federal Animal and Plant Health Inspection Service ("APHIS") of its intent to transport, ship and/or otherwise release into the environment LLRICE 601.

221.   Riceland and Producers breached this duty by shipping and/or transporting LLRICE 601 to its customers in violation of these regulations.

222.   Such breaches are the direct and proximate causes of the damages suffered by Tilda as stated herein

223.   As a direct and proximate result of the breaches of Riceland and Producers, Tilda has suffered damages as stated herein.

224.   The conduct of Riceland and Producers showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages in favor of Tilda.

**Count XVI - Negligence Per Se - Violation of Arkansas Rice Certification Act**

225.   Tilda realleges and reincorporates paragraphs 1 through 224 set forth above as if fully set forth herein.

226.   Arkansas Code Section 2-15-201 et. seq., which is contained in the Arkansas Rice Certification Act, provides:

As used in this subchapter:

(1)   "Characteristics of commercial impact" means characteristics that may adversely affect the marketability of rice in the event of commingling with any other rice and includes, but is not limited to, those characteristics:

(A)   That cannot be identified without the aid of specialized equipment or testing;

(B)   That create a significant economic impact in their removal from commingled rice; and

(C)   Whose removal from commingled rice is not feasible; and

(2)   "Person" includes any individual, partnership, limited liability company, limited liability partnership, corporation, firm, company, or any other entity doing business in Arkansas.

Ark. Code Ann. § 2-15-202.

No person may introduce, sell, plant, produce, harvest, transport, store, process, or otherwise handle rice identified as having characteristics of commercial impact, except in compliance with the provisions of this subchapter and the rules adopted by the State Board.

Ark. Code Ann § 2-15-203.

227.   The conduct of the Defendants (Riceland, Producers and Bayer), as set

41

forth above, violated, at a minimum, Ark. Code Ann. § 2-15-203.

228.   Defendants had a statutory duty not to violate Ark. Code Ann. § 2-15-203.

229.   Defendants' violations of Ark. Code Ann. § 2-15-203 are breaches of its statutory duty.

230.   Such breaches are a direct and proximate cause of the damages suffered by Tilda as stated herein.

231.   The conduct of the Defendants (Riceland, Producers and Bayer showed complete indifference to or conscious disregard for the rights of others, thereby justifying an award of punitive damages to Tilda.

232.   Tilda requests a jury trial of all claims stated herein.

WHEREFORE, Tilda respectfully requests that this Court enter judgment in its favor and against the Defendants and award Tilda such actual damages as are fair and reasonable, for injunctive relief requiring Defendants to decontaminate Tilda's storage and production facilities to prevent future contamination from GE rice, for punitive damages in a sum as will serve to punish Defendants and deter Defendants and others from like conduct, for its costs and attorney's fees incurred herein, and for all other just and proper relief to which it may be entitled.

Respectfully submitted,

BARBER, McCASKILL, JONES & HALE, P.A.
Attorneys for Tilda Ltd.
2700 Regions Center
400 West Capitol Avenue
Little Rock, AR 72201
(501) 372-6175

/s/ Perry L. Wilson

By:_____

| Perry L. Wilson | AR BIN 00017 |
| William H. Edwards, Jr. | AR BIN 80040 |

### CERTIFICATE OF SERVICE

I, Perry L. Wilson, hereby state that on this 15th day of January, 2008, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following or otherwise be forwarded via U.S. Mail to all counsel of record herein.

/s/ Perry L. Wilson

_____

Perry L. Wilson

In the Matter of an Arbitration Between:   )
            )
LIBERTY MUTUAL INSURANCE COMPANY  )
            )
        Claimant,     )   Case No. _____
            )
v.            )
            )
RICELAND FOODS, INC.      )
            )
        Respondent   )
            )

## CLAIM FOR ARBITRATION OF LIBERTY MUTUAL INSURANCE COMPANY

Claimant Liberty Mutual Insurance Company ("Liberty Mutual"), by its undersigned counsel, for its written demand for arbitration against Riceland Foods, Inc. ("Defendant" or "Riceland") hereby states as follows:

### THE PARTIES

1.     Claimant Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  It is licensed to do business in the State of Arkansas.

2.     Upon information and belief, Respondent Riceland Foods, Inc. is an Arkansas corporation, with its headquarters in Stuttgart, Arkansas.

### THE LIBERTY MUTUAL POLICIES

3.     For the period from August 1, 2005 to August 1, 2006, Claimant Liberty Mutual Insurance Company issued to Riceland a Commercial General Liability Policy, Policy No. TB1-191-012268-185 (the "2005-2006 Policy").  The policy provides general liability coverage on an occurrence basis with limits of $1 million per occurrence and $2 million in the aggregate (other than products-completed operations).  A separate $2



EXHIBIT
6

million aggregate limit is available for products-completed operations claims.  A true and correct copy of the 2005-2006 Policy is attached to this Complaint as Exhibit A.

4.     For the period from August 1, 2006 to August 1, 2007, Claimant Liberty Mutual Insurance Company issued to Riceland a Commercial General Liability Policy, Policy No. TB1-191-012268-186 (the "2006-2007 Policy").  The policy provides general liability coverage on an occurrence basis with limits of $1 million per occurrence and $2 million in the aggregate (other than products-completed operations).  A separate $2 million aggregate limit is available for products-completed operations claims.  A true and correct copy of the 2006-2007 Policy is attached to this Complaint as Exhibit B.

5.     For the period from August 1, 2007 to August 1, 2008, Claimant Liberty Mutual Insurance Company issued to Riceland a Commercial General Liability Policy, Policy No. TB1-191-012268-187 (the "2007-2008 Policy").  The policy provides general liability coverage on an occurrence basis with limits of $1 million per occurrence and $2 million in the aggregate (other than products-completed operations).  A separate $2 million aggregate limit is available for products-completed operations claims.  A true and correct copy of the 2005-2006 Policy is attached to this Complaint as Exhibit C.

6.     Subject to all other terms, conditions and exclusions, the Liberty Mutual Policies provide coverage as follows: "We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any

2

"occurrence" and settle any claim or "suit" that may result. But . . . [o]ur right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C." Policies, Commercial General Liability Coverage Form, Section I, ¶ 1.a.

      7.    The Liberty Mutual Policies each contain an amendatory endorsement that states that:

> Coverage is excluded under this policy for bodily injury or property damage caused in whole or in part by:
>
> A)    Cross Pollination
>
> B)    Failure of Germination
>
> C)    Transmission to plants grown with such seeds, of any Disease, Rust, Wilt, Fungus or Insects or Larvae or eggs thereof by seeds sold by the Insured.
>
> D)    Mis-Delivery, Mis-Packaging, or Mis-Labeling.

2005-2006 Policy, Endorsement No. 30; 2006-2007 Policy, Endorsement No. 29; 2007-2008 Policy, Endorsement No. 29 (the "Cross Pollination Exclusion").

      8.    The Liberty Mutual Policies define "occurrence" as "an Accident or Happening or continuous or repeated exposure to conditions which unexpectedly and unintentionally caused Personal Injury to or Destruction of Tangible Property." 2005-2006 Policy, Endorsement No. 31; 2006-2007 Policy, Endorsement No. 30; 2007-2008 Policy, Endorsement No. 30. Inherent in this definition of "Occurrence" is the concept of fortuity.

      9.    The Policies state:

> This insurance applies to "bodily injury" and "property damage" only if . . . Prior to the policy period, no insured listed in Paragraph 1. of Section II – Who Is An Insured and no "employee " authorized by you to give or receive

notice of an "occurrence" or claim,  knew that the "bodily
injury" or "property damage" had occurred, in whole or in
part. If such a listed insured or authorized "employee"
knew, prior to the policy period, that the "bodily injury" or
"property damage" occurred, then any continuation, change
or resumption of such "bodily injury" or "property
damage" during or after the policy period will be deemed to
have been known prior to the policy period.

2005-2006 Policy, General Liability Coverage Form, ¶ 1.b.(3); 2006-2007 Policy,

General Liability Coverage Form, ¶ 1.b.(3); 2007-2008 Policy, General Liability

Coverage Form, ¶ 1.b.(3).

    10.    The Policies exclude coverage for bodily injury or property damage

expected or intended from the standpoint of the insured.  *See* 2005-2006 Policy, General

Liability Coverage Form, ¶ 2.a; 2006-2007 Policy, General Liability Coverage Form, ¶

2.a; 2007-2008 Policy, General Liability Coverage Form, ¶ 2.a.

    11.    The Policies provide under "Duties In The Event Of Occurrence, Offense,

Claim Or Suit," in relevant part, that

        c.    [The insured] and any other involved insured must. . . .

            3.    Cooperate with [the insurer] in the investigation or
                settlement of the claim or defense against the "suit"; and

Policies, Section IV(2)(c)(3) (the "Cooperation Clause").

    12.    Each of the Policies contains certain other provisions, which limit or

preclude coverage to Riceland, as set forth in the insurance contracts, which are attached

as Exhibits A, B, and C.  In this regard, Liberty Mutual contends, inter alia, that:

- There is no coverage to the extent that the relief sought by the plaintiffs is
  equitable in nature or otherwise does not constitute "damages" within the
  meaning of the Liberty Mutual policies.

- There is no coverage under the Liberty Mutual policies for costs incurred solely to
  comply with statutes and regulations governing the insured's business operations.

- To the extent that the harm alleged by the plaintiffs does not constitute "bodily injury," "personal injury" and/or "property damage" as those terms are defined in the Liberty Mutual policies, there is no coverage.

- There is no coverage under the Liberty Mutual policies for bodily injury, personal injury and/or property damage which did not occur during the policy periods or within the policy territory.

- One or more policy exclusions, including but not limited to the exclusions addressing Pollution, Damage to Your Work, Damage to Your Product, Damage To Impaired Property Or Property Not Physically Injured and Recall Of Products, Work Or Impaired Property, may limit or preclude coverage for this matter.

- There is no coverage under the Liberty Mutual policies for costs and expenses or other obligations assumed by any insured without notice to and the consent of Liberty Mutual.

- To the extent that an insured failed to properly notify Liberty Mutual of an occurrence, accident, suit and/or claim as required by the Liberty Mutual policies, or otherwise failed to comply with all of the provisions (including conditions) and other prerequisites to coverage thereunder, coverage under Liberty Mutual's policies may thereby be precluded.

- To the extent precluded by the terms of the Liberty Mutual policies and/or public policy, there is no coverage for any punitive, exemplary or like damages that may be assessed against any insured.

- To the extent that coverage might otherwise exist, Liberty Mutual's obligations under its policies are limited by the "other insurance" condition, any deductible, any per occurrence, per person, or aggregate limits of liability, and any other policy provisions precluding the stacking or accumulation of multiple policy limits of liability.

## THE UNDERLYING LAWSUITS AGAINST RICELAND

13.    Riceland has been named as a defendant in at least 118 lawsuits brought by Arkansas rice growers (the "Grower Suits").

14.    The plaintiffs in the Grower Suits are residents and/or business entities located in various counties throughout Arkansas that own and operate rice farms. These entities sued Riceland and various other defendants seeking damages as a result of the

alleged contamination of the Arkansas and United States long-grain rice supply with genetically modified rice.

15.     Plaintiffs allege that Riceland knew that genetically modified rice seeds or crops containing these traits would cross-pollinate with other rice plants and contaminate the entire United States rice supply.

16.     In *Schafer, et al. v. Riceland Foods, et. al.*, No. CV-2006-413 (Ark. Cir. Ct., Lonoke, Cty.), for example, the Fourth Amended and Substituted Complaint contains the following allegations:

> ¶ 47: During all times relevant to this Complaint, including the years of 2000 and 2001, Riceland Foods, Inc., and the Bayer defendants knew that non-GE rice could become contaminated with Liberty Link rice, including LL62/601/604, through a wide variety of means, including cross-pollination and commingling during harvest, storage, transport and disposal.
>
> ¶ 83: In 2000 and 2001, Riceland and Bayer failed to take adequate steps to prevent cross-pollination and co-mingling of LL62 rice with non-GE rice.  Additionally or alternatively, Riceland and Bayer knew or should have known that no degree of precautions could have prevented such cross-pollination.
>
> ¶ 89: Riceland's and the Bayer defendants' course of conduct caused the GE contamination of the 2006 Arkansas long-grain rice crop as well as damage to the 2007 and 2008 crops.

A copy of the *Schafer* Complaint is attached hereto as Exhibit D.

17.     Riceland is also a defendant in at least 7 suits (the "Distributor Suits") filed by entities that purchased rice for distribution abroad, mainly in the European Union.

18.     The Distributor Suits allege that the underlying plaintiffs are business partners of Riceland, and that they purchased rice from Riceland pursuant to contracts

that obligated Riceland to provide non-genetically modified rice for distribution in European and other overseas markets.

19.     Plaintiffs further allege that Riceland and/or Bayer were well aware that European Union regulations banned importation and distribution of genetically modified rice for human consumption, but failed to take adequate steps to prevent contamination of non-genetically modified rice. For example, in *Veetee Rice Ltd. v. Riceland Foods, Inc., et al.*, No. 4:07-CV-463 (E.D. Ark.) the Second Amended Complaint (filed after the case was transferred to the Multidistrict Litigation pending in the United States District Court for the Eastern District of Missouri) states that "Bayer and Riceland have caused strains of genetically-modified rice to be grown experimentally in the United States, including LLRICE 62 and LLRICE 601" and that "[a]t all relevant times, Bayer and Riceland knew of the tremendous risk for such strains of genetically-modified rice to contaminate nongenetically-modified rice through cross-pollination. . . .". The complaint in *Huber Muehle GMBH v. Riceland Foods, Inc., et al.*, No. CV-2007-433 (Ark. Cir. Ct., Crittenden Cty.), Complaint at ¶ 31, alleges that "Bayer failed to take all reasonable and necessary steps to prevent cross-pollination with non-genetically engineered [rice]. Bayer knew, or should have known, before it grew or otherwise disseminated LLRICE 601 rice seed that such cross-pollination could not be prevented." A copy of the *Veetee Rice, Ltd.* Complaint is attached hereto as Exhibit E and a copy of the Huber Muehle GMBH Complaint is attached hereto as Exhibit F.

20.     The complaints in the Distributor Suits also allege that Riceland knew that its European customers would not accept GM rice, and that it delivered shipments that contained GM rice in fulfillment of contractual obligations to provide non-GM rice.

## THE PARTIES' DISPUTE

21.    Liberty Mutual is currently defending Riceland under a reservation of rights in connection with all the Grower Suits except *Heigle v. Bayer Cropscience U.S., et al.*, No. 06-4093 (W.D. Ark.) and *Lonnie & Linda Parson v. Bayer Cropscience*, No. 4:06-cv-1078-GTE (E.D. Ark.), which concern uninsured economic loss.  A copy of the January 21, 2010 letter from Liberty Mutual to Riceland concerning its coverage reservations is attached as Exhibit G.

22.    Liberty Mutual is currently defending Riceland under a reservation of rights in connection with all of the Distributor Suits except *Souflett Alimentaire v. Riceland Foods, Inc., et al.* (Valenciennes Commercial Court, France), which concerns uninsured economic harm.  Liberty's coverage positions are set out in its January 21, 2010 letter to Riceland, which is attached as Exhibit G.

23.    Liberty Mutual seeks a determination that it owes no duty to defend Riceland in the Grower and Distributor Suits, or obligation to pay any settlement or judgment, based on the application of the terms, conditions and exclusions contained in the Liberty Mutual Policies, and applicable law.  Upon information and belief, Riceland contends that the Liberty Mutual Policies provide coverage and opposes any such determination.

## ARBITRABILITY

24.    Each of the Liberty Mutual Policies contains an endorsement that adds an arbitration clause to the Policies.  That arbitration clause states that "[i]f [Liberty Mutual] and the insured do not agree whether coverage is provided under this Coverage Part for a claim made against the insured, then either party may make a written demand for arbitration" and provides for a decision to be made by majority vote of a panel of three

8

arbitrators. Because Liberty Mutual and Riceland do not agree whether coverage is provided for the Grower Suits and Distributor Suits, Liberty Mutual has made a written demand for arbitration.

### Count I – Declaratory Judgment Regarding Applicability Of The Cross Pollination Exclusion

25.     Claimant incorporates by reference each of the allegations set forth in paragraphs 1 through 24 of this Complaint.

26.     Claimant contends that the Policies do not afford coverage for the Underlying Matters and all similar lawsuits that have been or may be filed against Riceland. Specifically, coverage is barred, *inter alia*, by the Cross Pollination Exclusions in the Policies because injures caused in whole or in part by cross pollination, which are alleged in the underlying complaints, are excluded under the Policies.

27.     Claimant further contends that the Policies do not afford coverage for the Distributor Suits and all similar lawsuits that have been filed against Riceland because injuries caused in whole or in part by "Mis-Delivery, Mis-Packaging, or Mis-Labeling", which are alleged in the underlying complaints, are excluded under the Policies.

### Count II – Declaratory Judgment As To No Coverage Due To Knowledge-Based Coverage Defenses

28.     Claimant incorporates by reference each of the allegations set forth in paragraphs 1 through 24 of this Complaint.

29.     Claimant contends that the Policies do not afford coverage for the Underlying Matters and all similar lawsuits that have been or may be filed against Riceland. Specifically, coverage is barred, *inter alia,* because the Underlying Matters do not concern an "occurrence" as defined by the Policies, i.e., "an Accident or Happening or continuous or repeated exposure to conditions which unexpectedly and unintentionally

caused Personal Injury to or Destruction of Tangible Property." 2005-2006 Policy, Endorsement No. 31; 2006-2007 Policy, Endorsement No. 30; 2007-2008 Policy, Endorsement No. 30.

30.     Claimant contends that the Policies do not afford coverage for the Underlying Matters and all similar lawsuits that have been or may be filed against Riceland.  Specifically, coverage is barred, *inter alia,* because the Underlying Matters concern bodily injury or property damage which were known or should have been known to an insured or authorized employee prior to any policy period thereof. 2005-2006 Policy, General Liability Coverage Form, ¶ 1.b.(3); 2006-2007 Policy, General Liability Coverage Form, ¶ 1.b.(3); 2007-2008 Policy, General Liability Coverage Form, ¶ 1.b.(3).

31.     Claimant contends that the Policies do not afford coverage for the Underlying Matters and all similar lawsuits that have been or may be filed against Riceland.  Specifically, coverage is barred, *inter alia,* because the Underlying Matters concern bodily injury or property damage expected or intended from the standpoint of the insured.  *See* 2005-2006 Policy, General Liability Coverage Form, ¶ 2.a; 2006-2007 Policy, General Liability Coverage Form, ¶ 2.a; 2007-2008 Policy, General Liability Coverage Form, ¶ 2.a.

32.     Upon information and belief, Riceland possessed information prior to the inception of the Liberty Mutual Policies regarding or relating to the circumstances for which the underlying plaintiffs now seek redress, including, *inter alia,* the contamination of non-genetically-modified crops and rice stocks. Coverage is barred for the Underlying

10

Matters because, *inter alia*, under applicable law, there is no coverage for known loss under the Policies.

33.     Accordingly, there is no coverage under the Policies for the Underlying Matters, because there is no "occurrence," because losses or bodily injury or property damage were known or should have been known to an insured or authorized employee prior to the policy periods, because bodily injury or property damage was expected or intended by Riceland, and/or because Riceland possessed information regarding or relating to the contamination of non-genetically-modified crops or rice stock prior to the inception of the Policies.

## Count III - Declaratory Judgment As To No Coverage Due To Breach of Cooperation Clauses

34.     Claimant incorporates by reference each of the allegations set forth in paragraphs 1 through 24 of this Complaint.

35.     Claimant contends that Riceland is not entitled to coverage for the Underlying Matters and all similar lawsuits that have been or may be filed against Riceland under the Policies.  Specifically, coverage is barred to the extent Riceland breached the Cooperation Clauses in the Policies.

36.     Riceland took steps with respect to the Underlying Matters in violation of the Cooperation Clauses in the Policies, including, *inter alia*, failing to advise and consult with Liberty Mutual concerning defense of the underlying matters; and failing to forward requested information, including a budget for defense activities regarding the underlying matters, to Liberty Mutual.

11

## Count IV – Other Coverage Defenses

37.    Claimant incorporates by reference each of the allegations set forth in

paragraphs 1 through 24 of this Complaint.

38.    Additional provisions of the Policies other than those enumerated above

limit or bar coverage for the Underlying Matters and all similar lawsuits that have been or

may be filed against Riceland, including but not limited to:

- There is no coverage to the extent that the relief sought by the plaintiffs is equitable in nature or otherwise does not constitute "damages" within the meaning of the Liberty Mutual policies.

- There is no coverage under the Liberty Mutual policies for costs incurred solely to comply with statutes and regulations governing the insured's business operations.

- To the extent that the harm alleged by the plaintiffs does not constitute "bodily injury," "personal injury" and/or "property damage" as those terms are defined in the Liberty Mutual policies, there is no coverage.

- There is no coverage under the Liberty Mutual policies for bodily injury, personal injury and/or property damage which did not occur during the policy periods or within the policy territory.

- One or more policy exclusions, including but not limited to the exclusions addressing Pollution, Damage to Your Work, Damage to Your Product, Damage To Impaired Property Or Property Not Physically Injured and Recall Of Products, Work Or Impaired Property, may limit or preclude coverage for this matter.

- There is no coverage under the Liberty Mutual policies for costs and expenses or other obligations assumed by any insured without notice to and the consent of Liberty Mutual.

- To the extent that an insured failed to notify Liberty Mutual of an occurrence, accident, suit and/or claim as required by the Liberty Mutual policies, or otherwise failed to comply with all of the provisions (including conditions) and other prerequisites to coverage thereunder, coverage under Liberty Mutual's policies may thereby be precluded.

- To the extent precluded by the terms of the Liberty Mutual policies and/or public policy, there is no coverage for any punitive, exemplary or like damages that may be assessed against any insured.

12

- To the extent that coverage might otherwise exist, Liberty Mutual's obligations under its policies are limited by the "other insurance" condition, any deductible, any per occurrence, per person, or aggregate limits of liability, and any other policy provisions precluding the stacking or accumulation of multiple policy limits of liability.

39.     Nothing in this Complaint should be construed as a waiver by Liberty Mutual of any other coverage defenses under the Policies, and Liberty Mutual reserves the right to raise all other terms and conditions of the Policies as defenses to coverage as may be appropriate upon further investigation and discovery.

## Count V - Declaratory Judgment That Any Defense Obligation Is Limited To Reasonable and Necessary Costs

40.     Claimant incorporates by reference each of the allegations set forth in paragraphs 1 through 24 of this Complaint.

41.     Claimant contends that Riceland is not entitled to coverage for the Underlying Matters and all similar lawsuits that have been or may be filed against Riceland under the Policies.  In the alternative, Claimant asserts that any existing defense obligation is limited to reasonable and necessary costs for the defense of the Underlying Matters.  On information and belief, Riceland seeks to recover for amounts and activities that are not, or have not been shown to be, reasonable and necessary to the defense of the Underlying Matters, including, *inter alia*, for duplication of effort and multiple billers on particular tasks, for administrative (non-billable) work undertaken by attorneys or paralegals, for expenses typically forming a part of a law firm's overhead (e.g., long distance telephone, electronic research, fax, and express mail), for time entries with insufficient detail or description of tasks, and for excessive time spent on tasks.

13

## PRAYER FOR RELIEF

WHEREFORE, Claimant Liberty Mutual Insurance Company requests a determination and award against Riceland:

(a)     Determining as to the first cause of action that neither defense nor indemnity coverage is available under the Policies based on the Cross Pollination Exclusions contained therein;

(b)     Determining as to the second cause of action that neither defense nor indemnity coverage is available under the Policies based on Riceland's knowledge regarding or relating to the contamination of non-genetically-modified crops or rice stock alleged in the Underlying Matters;

(c)     Determining as to the third cause of action that neither defense nor indemnity coverage is available under the Policies based on Riceland's breaches of the cooperation clauses contained therein;

(d)     Determining as to the fourth cause of action that, under the additional provisions of the Policies noted *supra*, and applicable law, defense and indemnity coverage is limited or barred for the Grower and Distributor Suits;

(e)     Determining as to the fifth cause of action that any defense coverage available to Riceland under the Policies is limited to reasonable and necessary costs; and

(g)     For such other relief as the Panel may deem just and proper.

Dated: January 22, 2010

14